1823.

ORR
v.
POST.

---

### WILLIAM A. WEAVER

v.

### STEPHEN WHITNEY, ELISHA TIBBITS, GOOLD HOYT, and HENRY L. DEKOVEN.

W. a lieutenant in the navy, enters into an agreement with the owners of the merchant ship America, representing that commodore S. captain of the Franklin ship of war, being about to proceed to the Pacific, and being a friend of W. would afford particular protection to a ship and cargo, in which W. might be interested : and in consideration of the protection to be given by commodore S., and of the services of W., the owners of the ship America, agree to put on board a cargo and send her to the Pacific, to rendezvous with the Franklin, and to give W. certain commissions and profits. W. was to put on board a quantity of stores belonging to the Franklin, and to go in the America and represent her as a navy store ship, and himself as an American officer in charge of the stores ; and it was stipulated, that W. and commodore S. were to render protection and facility, to the master of the America.

This agreement is corrupt, and cannot be enforced.

THE bill stated, that in the month of August 1821, the following agreement was made between the complainant and the defendants Stephen Whitney, Elisha Tibbits, and Goold Hoyt, viz.

" Articles of agreement made the 24th day of August 1821, between Stephen Whitney, Hoyt and Tom and Elisha Tib-

1823.
Nov. 3, 4.

*Public trusts and offices.*
*Illegal contracts.*

1823.

WEAVER
v.
WHITNEY.

bits, owners of the ship America of the first part, and William A. Weaver of the navy, of the second part, witnesseth, that whereas it has been represented by the party of the second part, to the parties of the first part, that commodore Stewart in the Franklin seventy four is now about to proceed in the said ship to the port of Lima in the Pacific ocean, and that commodore Stewart being the particular friend of the party of the second part, and desirous of aiding him, would give particular protection to a ship and cargo in which he might be interested, to said port of Lima, and for greater security would appoint a place of rendezvous at St. Juan Fernandez, or elsewhere : now therefore, for and in consideration of the said protection so as aforesaid to be given by commodore Stewart in the Franklin, and the services of Lieutenant Weaver, it is agreed as follows : First, The parties of the first part agree to load their ship America with flour and salted provisions, and to put her under the command of captain Henry L. Dekoven, with orders to sail and proceed without delay to the port of Lima, touching at such place as may be fixed on, (say St. Juan Fernandez,) for rendezvous with the Franklin, and thence under her protection and direction to Lima. It is also understood and agreed, that lieutenant Weaver, is to put on board said ship a quantity of stores belonging to the Franklin, on which a freight is to be paid to the concern, and to go himself in the ship, and for her greater security is to represent her as a store ship, bound to the Pacific ocean, with stores for the navy of the United States, and himself, as an officer of the navy, in charge of such stores ; in consideration of all which services and protection so to be afforded, it is agreed, that the said captain H. L. Dekoven shall pay to the said party of the second part, at Lima, or other near port, one fifth part of the net profits of the voyage out, after deducting the costs and charges of the cargo, including insurance and interest of money and fourteen thousand six hundred dollars, freight of the same. It is also agreed, that lieutenant Weaver may put a private adventure on board, of not exceeding one ton outward, and the same amount home in the ship, should she return to the United States direct. It is further understood, that lieutenant Weaver and commo-

dore Stewart, are to afford to captain Dekoven, every facility and protection in their power, in leaving Lima, whenever the ship may be ready to sail.

" Second, it is further agreed, that if it shall be found impracticable, or not prudent, in the opinion of captain Dekoven, to enter the port of Lima, it is understood and agreed, that the ship may go to some neighbouring port, either in Peru or Chili :" which agreement was duly signed by the parties, and witnessed by the said Henry L. Dekoven.

The bill further stated, that in order to a more specific understanding of what charges and expenses were to be considered and included in the said sum of fourteen thousand six hundred dollars freight, an estimate was made and furnished by the owners of the ship, with the approbation of Dekoven, which was set forth in the bill, and of which, one item was, " Port charges, lading, &c. four thousand dollars ;" that the said ship was accordingly fitted out for the voyage contemplated in said agreement, and the complainant placed himself on board, and rendered the services stipulated by him ; that the ship was laden principally, but not wholly with flour and salted provisions ; and the said Tibbits furnished to the complainant a paper purporting to be an invoice of the cargo of said ship, and is annexed to the complainant's bill, but which does not contain a true statement of the cargo of the aforesaid ship, nor of the prices which were paid for said cargo, nor of the premium for the insurance on said cargo, but that the same have been intentionally overcharged, in order to lessen the amount of the complainant's share of the profits.

The bill further charged, that a great quantity of other goods of great value were laden on board of said vessel by the owners thereof, or some of them, without the knowledge of the complainant, and in fraud of his rights, contrary to the said agreement ; and that the said vessel was capable of taking at least five hundred barrels more of flour and provisions than she actually did take, and that such room was taken up with other goods belonging to the said owners, in violation of said agreement, and greatly to the prejudice of the complainant ; that the profits thereof, which were great, never have been account-

1823.

WEAVER
v.
WHITNEY.

ed for to him. That the said vessel proceeded on the voyage to Lima, and in the course thereof, put into the port of Rio Janeiro, where one John Heffernan shipped on board of her, sundry goods, to be sold on joint account of him and the said ship America ; which said goods were afterwards sold at Lima at a large profit, no part of which has been accounted for to the complainant. That in February 1822, the said vessel arrived with her cargo at Callao, (the sea port at which vessels destined for Lima unlade their cargoes, whence they are transported over land to Lima,) and in a few days thereafter, the captain sold twelve hundred barrels of flour, deliverable at Lima, at thirty five dollars per barrel, and that, if such sale had been carried into effect by the captain, he would have been obliged to pay ten dollars per barrel for expenses of duty on landing and of transportation to Lima; which expenses were estimated and allowed for, in the estimate of expenses, and provided for in the sum of fourteen thousand six hundred dollars mentioned in the agreement, under the denomination of freight ; that captain Dekoven, to the prejudice of the complainant, rescinded the said sale, and sold the whole cargo, including the twelve hundred barrels, at twenty four dollars per barrel, deliverable on board, and thereby avoiding the payment of duties and charges of transportation to Lima, and the disbursement of the whole sum of four thousand dollars, stated in the said estimate of expenses, which was contemplated to be covered by the sum of fourteen thousand six hundred dollars mentioned in the agreement, and that no allowance has ever been made to the complainant, for any part of the sum of four thousand dollars thus saved and unexpended.

That after the sale of the cargo, and after the outward voyage had closed, the complainant demanded payment of his one fifth of the net proceeds according to the agreement, and thereupon Dekoven rendered him an account, in which were various surcharges and omissions particularly specified.

That Dekoven would not settle with the complainant, or pay him at Lima, any other proportion of the profits than one fifth, according to the account so rendered, and the complainant was obliged to receive on account of such net profits, whatever sum Dekoven then chose to allow him, and actually

received on account of such net profits only the sum of twelve thousand three hundred sixty six dollars and six cents, although entitled to receive a much larger sum.

The complainant claims to be entitled to one fifth of the net proceeds of all the sales aforesaid, namely, of all goods laden on board of said vessel at New-York, or at any other place during the voyage, and to one fifth of the amount of the sales of the bread stuff, cordage, old sails, &c. The bill prays a discovery of the matters so stated and charged, and that an account may be taken, and the complainant be allowed his full proportion of the proceeds of all such sales.

To this bill the defendants put in a general demurrer as well to the discovery as to the relief prayed for.

Mr. GRIFFIN for the defendants, contended that the agreement set forth in the bill of complaint is void, as opposed to the law of nations, the municipal law, and the policy of the state.

An illegal contract cannot be enforced : this principle is well explained and defined by chancellor KENT, in Griswold v. Waddington in the court of errors, 16 John. 486. where he remarks, " It would be difficult to state any principle of " law, more plainly founded in common sense and true poli- " cy, than that which declares, that a plaintiff must not ap- " pear from his own showing, to have infringed the law of the " land, and if he does, he can not avail himself of the law to " enforce a contract made in opposition to the law. The " plaintiff must recover upon his own merits, and if he has " none, or if he discloses a case founded upon illegal dealing, " and founded upon an intercourse prohibited by law, he " ought not to be heard, whatever the demerits of the defend- " ants may be. There is to my mind something monstrous in " the proposition, that a court of law ought to carry into ef- " fect a contract founded upon a breach of law ; it is encour- " aging disobedience, and giving to disloyalty its unhallowed " fruits." It is equally fatal to the contract, if it is against the law of nations ; the law of nations is the municipal law of the land. Talbot's Cases, 283. 3d. ed., note to Barbuit's case ; 3 Burrow, 1480. ; Dallas, 114. An offence against the law of nations, is indictable. 2 Chit. Crim. Law, 28.

The undertaking of the complainant was illegal, and its performance would have subjected him to an indictment. Its object doubtless, was to evade the blockade of Lima. But whether this was so or not, his stipulations, which form the sole ground of his merits, were for personal services, which were merely nominal, while the protection of a national ship was the effectual consideration. Such a contract is unbecoming an officer of the navy, and the performance of it implies a violation, not only of his, but of the commodore's duty, and is also in itself, against the policy and law of the country, and the law of nations. Chitty's Law of Nations, 192. note P. Boston ed. ; 1 Com. on Contracts, 30.

It certainly cannot be permitted in our government, that an officer should exact a reward for doing his duty. The complainant stipulated for himself and commodore Stewart, either to do their duty, or to violate it : in the first case, there is no merit or ground for title ; and in the latter, the demerit is so great, that one is surprised at the hardihood of putting it forward openly in a court of justice, as a meritorious ground for recovery. It is sordid in an officer to sell the protection which his duty may require, and his station enable him to give the citizen, and to allow him to make merchandise of that duty, and the power of that station would be most dangerous, and can merit nothing but the severest animadversion. But the conduct of the complainant rises to higher criminality, when we see him, in performance of his stipulations, by the actual or pretended permission and countenance of the commodore, going on board the merchant vessel, and in the character of a lieutenant of the navy, representing her as a national store ship attached to the Franklin, and claiming for her under the commodore's protection, the privileges of such a vessel ; and under deception, carrying on commercial speculations, which we are left to imagine, rather than to know. The right of visitation and search was thus evaded. Chitty's Law of Nations, 192. note. This imposition practised under the sanction of his official character, involved therefore a direct breach of the law of nations ; and put in jeopardy the friendly intercourse of different governments.

By the rules and regulations for the government of the

United States' navy, national ships are prohibited from being employed as merchant ships, or from carrying merchandise, except in cases of distress, arising from accident. Ingersoll's Digest, 626. articles 22, 23.

These articles establish a principle, separating the officer from the man, and prohibiting the merchant from the prostitution of the national flag.

The contract is also void, as being against sound policy. Com. on Cont. 32. Many cases exist of contracts void on this ground, such as agreements with sheriffs and jailors, marriage brokage bonds, simoniacal contracts, &c.

MR. VAN WYCK for the complainant. The recital in the agreement formed no part of it, and as far as it regarded commodore Stewart, was mere opinion and hope. The consideration for the agreement was, the services of the complainant; and there is no evidence, that commodore Stewart assented to, or knew of the agreement. As to the appointment of a rendezvous, it was proper that some place should be appointed for that purpose, where the store ship should meet the Franklin, and St. Juan Fernandez, certainly was not an improper place.

There is nothing unlawful in the defendants availing themselves of the appointment, and also of the protection and even friendship of the commodore; the America was laden with stores for the Franklin, and the complainant was a lieutenant in the navy, and had charge of those stores; there is therefore nothing untrue in the representations to be made by the complainant, or inconsistent with his duty, but every thing coincident with it. It does not appear that the Franklin had to go out of her way, and commodore Stewart had a right to fix the place of rendezvous. They were to meet and proceed together to Lima. It was a long voyage and great stores would be necessary.

The condition which avoids a contract, must be to do an illegal act, or to omit a duty. 1 P. Wms. 189.; 1 Fonb. sec. 4. 213.

So far from its being the intention of the parties to break the blockade of Lima, it appears from the very agreement, that such was not their intention; for it provides in case of the blockade of that place, that the vessel should go elsewhere.

1823.

WEAVER
v.
WHITNEY.

3

It was not illegal to clear out for Lima, even if it was block-aded; for it was not only possible but probable, that the block-ade would be raised before the arrival of the America, and then her entry would be lawful.

It would be oppressive and impolitic, to debar officers of the navy from engaging in commerce. They ought not to depend solely on their pay. The interest of the navy is promoted by its officers in time of peace, engaging in the merchant service. An officer may contract to do his duty; the compensation will be an additional stimulus. But to make the contract void, the object must have been unlawful.

As to the America being a store ship, that was exactly true, and there was no misrepresentation. It was the duty of the Franklin to protect her and all other American vessels; this was no violation of duty.

MR. T. A. EMMET on the same side. In a demurrer, no fact is to be noticed, except such as appears in the bill. The blockade of Lima, does not appear in the bill, and it can not therefore be intended that the parties had in view its violation.

But if the court will, as a matter of history, take notice of the blockade, as existing at the time of the agreement, yet as it might be raised when the vessel should arrive, it is not a fair presumption that there was an intention to violate it.

Unless commodore Stewart can be connected with the contract, it can not be considered illegal. It is plainly inferrible that the complainant had the charge of forwarding the stores for the Franklin, for the freight was charged him. There would not have been any thing illegal in his employing his own vessel for this purpose. He saw fit to employ the defendants, and to admit them to a participation in an undertaking which he might have engrossed to himself. In this there is nothing illegal. If the stores for the Franklin did not occupy the whole burden of the vessel, he might allow the owners to complete the cargo on their private account. Nay, it is probable that a prudent economy on the part of the commodore required it; and if the vessel derived any particular advantage from the protection of the Franklin, as her store ship, it was the owners' good fortune, and not their fault. The protection of commerce was the business of the commodore,

and it was his particular duty to protect vessels carrying his stores. The vessels must meet, and therefore a rendezvous must be appointed.

Again, there was nothing illegal in the commodore's conduct, in soliciting his friend to take charge of, and accompany the stores : and no law or policy forbade the complainant from engaging with the owners in their private adventure. It is not a case of carrying merchandize under the article cited.

Again, no neutral rights were or could be violated: for by the treaty of San Lorenzo, the right of search is relinquished between this country and Spain ; and if it were otherwise, a ship can not be considered a national vessel, unless she is commissioned as such. Preference and services were the true consideration for the contract.

MR. GRIFFIN in reply. The protection to be afforded by commodore Stewart entered into the essence of the contract; it is twice mentioned in the agreement; is there set forth as the consideration; and on it the complainant founds his claim to a participation in the profits of the voyage. I am not to say whether commodore Stewart knew of the contract or not; it is sufficient that his friend and subordinate officer stipulated for his acts, and these stipulations were performed. The appointment of the rendezvous was made in this country ; the stores were put on board ; the complainant, by the permission of the commodore, went on board the America, took charge of those stores, and as an officer of the navy, represented her as a store ship of the Franklin. She was joined at the place of rendezvous by the Franklin, and from there taken under her particular protection: and if we may judge from the immense profits of the voyage, the parties experienced more than ordinary good fortune or friendship.

The services of the complainant, it is alleged, formed another part of the consideration of the contract. They were,

1st. To put on board the America a quantity of stores belonging to the Franklin.

2d. To represent her as a store ship for the American navy.

3d. To represent himself an officer of the navy in charge of those stores.

The first part of the service was to be a mere pretence

and cover, and the second and third, falsehoods and imposi-- tions; and altogether, they form a prostitution of his official character to purposes which are repugnant to the policy and laws of the country, the law of nations, and the honor of an officer. The preference given to the defendants to carry out stores for the Franklin, did not enter into the conditions of the contract. The stores put on board were a mere pretence and color; for by referring to the schedules, it appears, that the whole freight for those stores amounted to only nine hundred and twelve dollars; less than a twelfth part of the whole freight.

The treaty of San Lorenzo did not indiscriminately prohibit the visit and search of vessels; it regulated that right. Spain never claimed the right to visit and search a national ship. The faith of the nation is considered pledged that national vessels shall not engage in commerce; and it is the attempt to violate that faith which heightens the misconduct of the complainant.

There can be no objection to officers of the navy engaging in mercantile speculations, but they ought not to be allowed to speculate with the honor and safety of the country, or make their character and influence a matter of traffic.

If an officer were put on board a ship to represent her as a store ship for the navy, while under the protection or direction of a ship of war, the fact, if so, would give her a national character, and the commander of the squadron would be justified in protecting her, as his store ship, from search, detention, or capture.

THE CHANCELLOR. This contract is clear and explicit. An officer of the navy of the United States, agrees with the owners of the ship America and a cargo, about to proceed from New York to Lima, that the Franklin, a ship of the navy of seventy four guns, also about to proceed to Lima, shall give special protection to the America and her cargo; and that he the officer, shall go in the America, and shall represent her as a store ship, bound to the Pacific ocean, with stores for the navy of the United States, and himself as an officer of the navy in charge of such stores. In return for this

protection and this service, the owners of the America and her cargo, agree to pay to this officer one fifth part of the profits which may arise from the outward voyage of the America and her cargo.

The question before me, is, whether this contract is legal or not.

In support of this contract, it is urged, that the services here stipulated to be performed by officers of the navy, were acts of duty on their part, which they would have been bound to perform, if no contract had been made ; and that the compensation here promised for those services, was merely a private addition to their public emoluments, which could not divert them from their public duty, and would operate only as an additional incentive to its performance. For the sake of argument, let it be admitted, that every thing here stipulated by Weaver, was within the scope of public duty ; and the question will then be, whether an officer of the navy may bargain for a private reward for the discharge of a public duty. If Weaver or other officers of the navy, were bound to do the acts in question, they were bound to perform them as portions of the public service, as acts of public duty pertaining to their official stations.

An officer of the navy can not bargain to discharge a public duty, for a private reward, any more than to omit such duty.

The rewards of these officers, are established by law ; their services are to be performed for those legal rewards; and other private rewards for acts which are required from them as public duties, by the laws of their country and the obligations of their stations, must be regarded as corrupt and illegal exactions. The idea that an officer employed by the public for the performance of a public trust, and paid by his country for his services, may take additional and private compensations for the discharge of his official duties, is wholly inadmissible. A distinction between bribes for doing a duty, and bribes for violating a duty, may exist in casuistry; and a bribe which has produced a violation of duty, may, when viewed in connexion with its effect, be more criminal, than a bribe not followed by such a result. But the idea now suggested, that bribes for doing a duty, are lawful, is a conception, which never yet found a place in any code of law, or in any system of morals. Vain is the suggestion, that private rewards like these, are innocent incentives to duty. That he

who must be corruptly bought to do his duty, will perform any duty with fidelity, is an idle supposition. The necessary tendency of such rewards is to debauch; and the faithful discharge of a public trust, can not be expected from him who will accept a bribe to do his duty. The distinction between bribes to obtain the discharge of a duty, and bribes for other objects, is far too subtile and fallacious for practice ; a restraint too feeble, either for the suborner or for the officer accepting a bribe ; a barrier too slight to secure fidelity and integrity in the discharge of public trusts. If these different cases of bribery involve different degrees of moral guilt, both are still crimes ; and the sophistical pretence now advanced, that an act criminal in itself, becomes lawful, when the intention of the parties committing the offence, is to promote the due performance of the public service, must be rejected. The argument that private compensation might be justifiably received for the protection and the services stipulated by this contract, because these objects were matters of public duty, is in itself unsound, subversive of the clearest principles of law and morals, and inconsistent with the pure administration of public trusts. If the services engaged by this contract, were within the scope of public duty, they were to be performed as a public duty, which could not be bought or sold for private gain.

If this contract stipulates, that the officers named should do something not their public duty, it is still more plainly corrupt, as involving both a violation of duty, and a pecuniary reward for such an act.

Whether therefore, the protection to be given by the ship Franklin, and the services to be performed by Weaver, were acts of duty on the part of those who were to perform them, or acts transgressing their public duty, the agreement is in either view corrupt and illicit ; and either degree of turpitude vitiates the contract.

But it is evident, that the object of this contract, was not merely to engage officers of the navy, to do their duty. For such a purpose, no contract was necessary. The object here was to obtain advantages which could not be obtained or were not expected, without this contract. The special pro-

tection of the ship Franklin, and the representation that the America was a store ship, bound to the Pacific ocean with stores for the navy of this country, and that Weaver was an officer of the navy in charge of such stores, were the objects for which a price was to be paid ; and these objects were not matters of duty. The particular protection which the ship Franklin was to afford to a ship and cargo, in which the particular friend of the commander of the Franklin should be interested, cannot be viewed, as a legitimate duty ; and the contrivance by which the America was to be represented as a store ship of the United States, was a fraudulent disguise. Acts like these, were not acts of public duty ; nor did these merchants agree with Weaver, that they should pay, or that he should receive a large portion of the profits of their adventure to Lima, as a compensation for the discharge of any public duty. The objects of this contract, were wholly foreign to any such duty.

The America was not a store ship of the United States, and the expedient of sending some stores of the navy in that ship, was evidently adopted to conceal a falsehood, under some color of truth, and to give to the America and her cargo, the guise of public property of the United States. This contrivance was a fraud upon the United States, their public service and their sovereignty ; a fraud upon the rights of other nations ; and a fraud in all respects. The contract exhibits this artifice in its naked character of fraud.

I inquire not, what was in fact done, by the ship Franklin or her officers, in pursuance of this contract. What was done or omitted, after this contract was made, is of no moment in deciding upon its legality. The special protection intended, may have been given to the America and her cargo, and every public duty of the commander of the Franklin may have been also discharged. But it is manifest, that while the ship Franklin should be engaged in giving special protection to the America and her cargo, other protection to other vessels and other commerce might be withheld, and other services might be neglected. The obvious sense of the contract is, that the protection to be given, should be special and unusual ; and without some reason better than those which appear in this

*The agreement is a fraud upon the United States, and upon the rights of other nations, and a fraud in all respects.*

1823.

WEAVER
v.
WHITNEY.

contract, such extraordinary protection could not be an act of duty. The protection to be given, was protection to the voyage of the America; that ship was to be represented as in the service of the United States; and thus, the force of the Franklin was engaged to be used, not merely for such protection to private commerce as might be legitimate, but also, as it seems, for the purpose of enforcing a fraudulent usurpation of the rights of a public vessel of the United States.

The service upon which the Franklin was about to proceed to the Pacific ocean, and the instructions of the government concerning the employment of that ship, do not appear; but whatever may have been the objects of the government in that expedition, it must be supposed that the commander of the Franklin had much latitude of discretion in respect to his voyage, and the employment of the force entrusted to his direction. In all naval service, the commanding officer of a distinct force, has and must have, a wide extent of mere discretion, in the choice of his operations, and in the employment of his force. Such a discretion should never be subject to the influence of motives of private gain. That the force of the nation should be employed by public officers, for their private profit; that they should make bargains to employ that force, for their own benefit; and that they, who receive the honors and rewards of their country, for performing a branch of its service, should reap the fruits of such contracts, would be prostitutions of all duty, law and public principles. The national force belongs to the nation itself, to be employed by the government under the laws, for public objects; the emoluments of all who wield that force or direct its use, are established by law; and all private compensations for the use of that force, are corrupt and illicit.

The duties of officers of the navy, are in many cases, defined by law; in others, they depend upon the instructions of their executive superiors; and where regulations have been established by law, they must prevail. The twenty second article of the regulations established by law, for the government of the navy, provides, that "the officers and privates of "every ship or vessel, appointed as convoy to merchant or oth- "er vessels, shall diligently and faithfully discharge the duties

The twenty second article of the navy regulations, declares the case there specified, a principle equally applicable to every branch of the public service.

" of their appointment, nor shall they demand or exact any " compensation for their services, nor maltreat any of the offi- " cers or crews of such merchant or other vessels, on pain of " making such reparation as a court of admiralty may award, " and of suffering such further punishment as a court martial, " shall adjudge." This regulation declares the great princi- ple, that compensation shall not be exacted by officers of the navy, for their services. It relates to cases of convoy, its ob- ject being, to authorise summary redress and summary pun- ishment for exactions in those cases ; but the principle concern- ing compensations, is applicable to all the services of those officers. The laws of the union determining the emoluments of officers of the navy, exclude all other compensation ; not expressly, but by necessary consequence. When the emolu- ments of public officers are stated and determined by law, and paid in a manner prescribed by law, the rewards of those officers for all their services, are the rewards thus given by their country. All other compensations direct or indirect are illegal, not only as corrupt, but also as transgressing both the legal amount and the legal manner of compensation. The laws which define and limit the emoluments of those officers, virtually prohibit all other compensation for their official ser- vices ; and any rewards beyond those prescribed are illegal.

*Where the laws of the union deter- mine the com- pensation for a public ser- vice, they ex- clude by ne- cessary con- sequence, all other com- pensations, and all such are illegal and corrupt.*

The United States have in some cases, adopted the princi- ple of stimulating their officers to duty and activity, by re- wards proportioned to the success of official exertions. The shares of penalties and forfeitures, given to officers of their re- venue, and the portions of prizes, allotted to officers and sea- men of the navy, are provisions of this character. But all these are legal regulations ; and whatever may be the servi- ces of any of those officers, all their rewards, ordinary and extraordinary, are given and limited by law.

Whether therefore, I regard the corruption of a practice which should permit officers of the navy to employ the na- tional force for their private profit, or consider the laws esta- blishing and limiting the emoluments of those officers, I find the strongest reasons to decide, that all private compensations are illegal.

4

1823.

WEAVER
v.
WHITNEY.

This is in substance, a contract for a bribe to a public officer. It is unnecessary to examine the turpitude of this transaction, in comparison with bribes to magistrates, or other agents of the public, or to graduate the guilt of different cases of the same crime. All such bribes and all such contracts, are illegal. The motives of such contracts must always be corrupt; or if such a case can exist without the guilt of corruption, the direct tendency of all such transactions to corruption, renders it necessary, that they should be universally unlawful.

· It is unnecessary to cite authorities to show, that illegal contracts are not enforced by the courts of the country, whose laws they violate or evade. This principle is fully established in our law; and is indeed, fundamental in every code. A system of laws destitute of such a principle, would be inconsistent with itself; and the regulations of society would be easily frustrated, if men were at liberty to contravene them by compact, and to claim the faith of contracts, as a sufficient reason for violating the laws of their country.

The faith of contracts cannot be claimed for a violation of the laws.

In all cases of this nature, where a contract not prohibited in express terms, is impeached, as in effect violating the principles and policy of express laws, an examination of the policy of the laws, and of the operatio. and tendency of the contract, becomes necessary. I have thus examined this contract and the principles applicable to it. The present case is, in its circumstances, without a precedent, and I rejoice in the want of any preceding case like this, as I regret, that this has occurred. The absence of a precedent, is not a want of principles; and those which must govern this case, are clear and undoubted. My duty is, to pronounce, that the stain of this transaction, rests not on the laws of this country. This contract being illegal, its execution cannot be enforced; and the suit is dismissed with costs.