## Case No. 11,114.

### PIATT v. OLIVER et al.

[1 McLean, 295.]

Circuit Court, D. Ohio. Dec. Term, 1837.

CONTRACTS — AGAINST PUBLIC POLICY — FRAUD — PLEADING IN EQUITY — PLEAS IN BAR — FORM.

1. A contract made in fraud of the law, or against public policy, is void.

[Cited in brief in Breslin v. Brown, 24 Ohio St. 568. Cited in Richardson v. Buhl, 77 Mich. 661, 43 N. W. 1102.]

2. An agreement between two or more persons not to bid at a sheriff's sale, against each other, and that one shall purchase for the benefit of all, *held* to be void.

[Cited in Hill v. Smith, Case No. 6,499.]

[Cited in Loyd v. Malone, 23 Ill. 48; Phippen v. Stickney, 3 Metc. (Mass.) 387.]

3. But sales on execution may well be distinguished from voluntary sales; and especially sales of public lands, made at public auction by the United States. That an association of individuals cannot purchase at such sales, is a novel doctrine.

[Cited in James v. Fulcrod, 5 Tex. 512.]

4. A plea in bar to a bill, must be full and complete, to every part of the bill, and the fraud charged must be denied by an answer filed in support of the plea. And if the plea does not set up a bar to every equitable allegation in the bill, it will be set aside. In this respect the rule is the same in chancery as at law.

5. The defendants in their answers may insist on the same matters, as might be, or have been, pleaded in bar.

6. Pleas in bar, which seek to avoid the equity of the case, are not to be favored. Great strictness in their form and substance is required.

In equity.

Swan & Fox, for complainant.

Wright & Worthington, for defendants.

OPINION OF THE COURT. The complainant represents that about the 20th July, 1817, he, John H. Piatt (then living, but since deceased), William M. Worthington, and Gorham A. Worth, being the equitable owners of river lots, numbers one, two, eighty-six, and eighty-seven, in the United States, reserve of twelve miles square, on the Miami of Lake Erie: And that Martin Baum, Jesse Hunt, now deceased, Jacob Burnet, William C. Schenck, William Barr, William Oliver, and Andrew Mack, being owners in equity of numbers three and four, in the same reserve; it was agreed between them that the said several tracts, containing nine hundred and seventy-three acres of land, should be the common property of the several parties; that is, the one undivided half should be held and owned by the persons first named; and the other half by the persons named secondly. That it was agreed the parties should pay of the purchase money unpaid, as the same should become due to the United States, according to their respective interests. That the certificates of purchase were transferred to Martin Baum, as a trustee, to hold the

--------

¹ [Reported by Hon. John McLean, Circuit Justice.]

land for the benefit of all concerned; which trust he accepted and continued to act under it until his decease. That afterwards the parties agreed to lay out a town on said land, which was named Port Lawrence, and laid off the same into lots, streets, &c. And for the purpose of carrying their plan into effect Martin Baum, in his capacity of trustee as aforesaid, appointed the said William Oliver an agent for said parties interested, to act for them, and gave to him a letter of instruction, dated 14th August, 1817. That said Oliver at the same time executed a bond in the penalty of $20,000, conditioned for the faithful performance of the duties of such agency. That the parties first named in July, 1817, purchased at public sale, at the rate of two dollars per acre, and paid the first payment of fifty cents per acre thereon, viz: the south-east, the north and south-west quarters of section number three, township three, in the same reserve; the certificates of which were assigned to said Baum in trust, for the purpose of paying the balance due thereon, and to hold the same for the benefit only, of the parties first named aforesaid. That part of the land above stated was purchased at very high prices—as high as $70 per acre; and from reducing the public lands by congress, and the general embarrassment in the West, the price of land was greatly reduced; and it was determined by the parties to relinquish a part of the land to the United States, under the act of March, 1821, and the act amendatory thereto, of the 27th September, 1821. That the tracts of land, numbered one and two, were relinquished by Micajah T. Williams, who was appointed an agent for this purpose by Baum, and who had purchased a part of the interest of the said Oliver. And the amount of monies paid thereon being the sum of four thousand eight hundred and seventeen dollars and fifty cents, was applied as follows: Six hundred and eighty-six dollars and seventeen cents, being half the amount of purchase money due on lots 3, 4, 86, 87, by the parties first named; and $1248 as a final payment for the same parties on the five quarter sections entered by first parties. The balance of the said half of the sum of $4817 50 being $474 60 has not been paid over or accounted for. That the above land was relinquished with the intention of buying it again when it should be offered for sale, for the benefit of the parties originally interested. And in the year 1827 a public sale was directed, by the president, and among others the said tracts, one and two. At this sale the complainant and Martin Baum, trustee, attended to purchase said lands, and would have purchased them, for the benefit of the parties aforesaid; but on the day of sale, they were not offered, by the order of the president. Said tracts were situated adjoining the southern boundary of the Michigan territory, and over which the said territory exercised jurisdiction: and the trustees of the university of Michigan located them,

under a law authorizing the location of lands by the university. Immediately after this selection was made, Baum, as trustee, remonstrated against it, and authorized the defendant, William Oliver, as agent of the parties interested, to negotiate with the trustees for an exchange of the land thus selected, if congress should approve of the same; and by an act of 30th January, 1830, the trustees on the 7th February, 1831, did relinquish to the said Oliver, as assignee of Martin Baum, trustee, their right to the said lands. And on the 14th March, 1831, while acting as agent, secured a patent for said tracts of land, one and two, from the United States, in his own name. That said Oliver transferred the certificates of said quarter sections so purchased by the complainant and the persons first named, without their knowledge or consent, to obtain the title of the two lots aforesaid. The above quarter sections were the southwest quarter of section three, township three, and south-east quarter and north-west and south-west quarters of section three, township three, in said reserve.

The said Oliver in the aforesaid transactions acted in his capacity of agent, under the authority from Baum the trustee. And the complainant charges that Oliver afterwards purchased a part of the lands of the university, which he transferred to it, and in the settlement of the account should be compelled to account for the same. That Oliver claims to hold the lots of land, patented to him in his own name, as his individual property, and has sold a part of the land to Micajah T. Williams, and is selling other parts, and threatens to sell the whole, &c. That Oliver and Williams disclaim the agency, and are acting in the disposition of the lands for their own interests. An injunction is prayed to stay sales, and that the said Oliver shall account, &c., and convey for the benefit of his principals the lands above stated.

Micajah T. Williams, as to so much of the bill as sets up a claim to said lots number one, two, three, four, eighty-six, and eighty-seven, or to any part of them, or the proceeds thereof, pleads in bar, that on the third Tuesday of July, in the year of our Lord eighteen hundred and seventeen, the United States were the owners in fee simple, and that the president by proclamation offered the above with other tracts of land for sale at public auction, at Wooster, in Ohio, on the said third Tuesday of July. That previous to the day of sale, the two companies named in the bill were formed with the intention of purchasing said tracts for speculation. That one of said companies consisted of Robert Piatt, John H. Piatt, William M. Worthington, and Gorham A. Worth; that the other company consisted of Martin Baum, Jesse Hunt, Jacob Burnet, William C. Schenck, William Barr, William Oliver, and Andrew Mack. That on the day of sale the companies were represented by their agents, (to wit), the first named company by Robert

Piatt, and the other by William Oliver, William C. Schenck, and Andrew Mack; and before the sale the lots one, two, three, four, eighty-six, and eighty-seven, were selected by the agents of both companies, to purchase; and this being discovered, the two companies entered into an illegal combination not to bid against each other, so that the lots could be purchased at less than their value; and that the purchase so made should be made for the joint benefit of both companies. That in pursuance of this arrangement the purchase was made of the lots at less than they would have sold for, had no such illegal combination been entered into, and the certificates of purchase were made out in the name of Martin Baum, and this the said Williams pleads in bar to any relief, &c. And he further pleads in bar, that an attachment issued against the said Martin Baum, Robert Piatt, William M. Worthington and Gorham A. Worth, by the name of George A. Worth, and a judgment was rendered thereon against them by the justices of Monroe county court, for the county of Monroe, in the territory of Michigan, in October term, 1825; and an execution, or other final process was duly issued thereon, the said three quarter sections and all the right of the persons above named was duly seized and sold, and conveyed in due form of law to one Charles Noble, for the value thereof paid, and thereupon afterwards, on the twenty-second day of August, 1828, Noble conveyed the same to William Oliver, which was long after the termination of his agency aforesaid. That Oliver obtained a patent for the three quarters in his own name, and he afterwards conveyed them to the Michigan University, and without notice of any other right, &c.

The defendant Oliver filed a plea similar to the above, and denied the allegations of fraud.

The main question raised by the plea has been elaborately discussed. And it is contended if the agreement not to bid against each other was void, it being against public policy, that all the other transactions connected with such an agreement, or growing out of it are also void. In 3 Story's Laws, 1595 [3 Stat. 318], the act provides for the survey and sale of the public lands, under which the sale in question was made. There can be no doubt that any contract made in fraud of the law, or against public policy, is void. And this doctrine is well established in the authorities which have been cited. And it is equally well established that equity will never aid a party by carrying into effect such a contract. But, whether the agreement set forth in the plea is in violation of public policy or in fraud of the law, is the matter in controversy between the parties. In 3 Johns. Cas. 29, the court decided that a note given on consideration of forbearance to bid at a public auction was fraudulent and void, as against public policy. The note was given to the plaintiff in the judgment on which the

sale took place, promising to pay him one hundred and fifty dollars in addition to his judgment, not to bid at the sale. And in 6 Johns. 194, the court held an agreement void between A and B who agreed not to bid against each other; a suit being brought for the profits, by A against B who purchased. And in 13 Johns. 112, at a sheriff's sale, two agreed not to bid against each other; the agreement was held to be void. So in. 4 Cow. 732, an agreement not to bid against each other, and that one should purchase for the benefit of both, was ruled to be void. And in 4 Johns. Ch. 254, the plaintiff in an execution made a contract not to bid, and the property was sacrificed, the contract was decided to be void. In Dev. 126, it was held that a deed was void in an action of ejectment, given in pursuance of an agreement between two persons, not to bid against each other on a sheriff's sale, and that one should purchase, for the benefit of both. And in 1 Story, Eq. 290, 293, the principle is laid down that where persons agree not to bid against each other at a public auction, the agreement is void. And in 2 Ohio, 504, the court held that an agreement that one individual should purchase land sold at public auction, for the tax due thereon, in behalf of a company was void, it being against public policy. And in Doug. 450, where the plaintiffs were suttlers to furnish hay, &c. agreed among themselves not to furnish, but to receive the money, being in fraud of the government, was void. And to the same effect are the cases in [Hannay v. Eve] 3 Cranch [7 U. S.] 242, 247, 248; [Brown v. Gilman] 4 Wheat. [17 U. S.] 258; [Sharpless v. Welsh] 4 Dall. [4 U. S.] 279; 1 Bin. 110; 3 Page, Ch. 154; 3 Madd. 66; 3 Mer. 468; 5 Johns. Ch. 327; 1 Hopk. Ch. 11; 16 Johns. 438; 2 Wils. 350; [Bartle v. Coleman] 4 Pet. [29 U. S.] 184.

The above cases are generally founded upon fraud, and most, if not all of them were decided under the authority of the cases in 6 Vern. 642, and Cowp. 395. And some of them are not strictly in accordance with the principle laid down in Sugd. Vend. 18, and in 3 Ves. 620, 625, note; 11 Serg. & R. 86; 2 Hammond, 182; 12 Ves. 477; 2 Brown, Ch. 326; 1 Jac. & W. 390; 4 Cow. 732, 734. But as it regards the present plea it is not necessary to decide this main point in the case. It may not, however, be improper to remark, that some of the cases cited carry the doctrine, of avoiding contracts, as against public policy, to its utmost limit. And indeed it may well be doubted whether sound policy requires the doctrine to be extended as in some other cases it has been done. To hold that individuals may not associate together for the purpose of purchasing lands of the United States, at a public sale, would be a novel doctrine, and contrary to what has been generally practised by purchasers, and that under the sanction of the government. And it by no means follows, that such associations, when entered into fairly, purchase lands lower than individuals. The exorbitant price the land sold for at the sale is proof of this. Before the present sytem of land sales was adopted, it was the practice of the government to sell large tracts of the public lands to associated individuals at reduced prices. And since the present system, it is doubtful whether there has ever been a public sale at which private associations did not purchase more or less. Arrangements are often made not to bid against an individual, who may have settled on and improved the land he wishes to purchase; and this has been no ground of complaint by the government. On the contrary, by numerous acts, congress have secured to such settlers pre-emption rights.

Congress have guarded against a sacrifice of the public lands, by fixing a limit, below which they shall not be sold; and at which, after the public sale, they may be entered. It may well be a matter of doubt whether these sales, being voluntary by the government, and made on a national scale and under regulations adapted to prevent frauds, come under the same rule as sales on execution. The policy of the government is not more to sell at a high price, than to afford an equal and fair opportunity to all who are desirous of purchasing, to purchase. And whether an individual shall bid against a company or not, seems in no respect to defeat the object of the government. If the competition be open and fair, there can be no ground of complaint by bidders, and none by the government. Where puffers are employed by the seller of property, in order to deceive bidders, and sell at an exorbitant price, or where property under execution is to be sold, for an individual to buy off bidders, in order to purchase the property at less than its value, is fraudulent, may be admitted; but these cases, both as it regards the circumstances and the question of policy, are distinguishable from the case under consideration. The plea no where alleges that the tracts of land were purchased by the company at less than their value; but the allegation is, that they were sold for less than they would have sold for, if the combination to purchase had not been formed. Now this is a fact which cannot be traversed, as it is not ascertainable by evidence, and on which an issue could be taken. The presumption is strong that the land was sold for more than its value, from the price at which it was struck off; and from the fact that it was afterwards relinquished to the United States by the purchasers. But the decision of this point, as before remarked, is not necessary to dispose of the plea, and it will not now be decided.

The matters set up in the plea must be a complete bar to the equity of the bill. The rule is the same, in this respect, in equity as at law. If there is any matter of equity in the bill to which the plea does not set up a bar, and which is not denied by way of answer, the plea must be set aside. 5 Madd. 47,

203, 260; 4 Johns. Ch. 693; 11 Equity Dig. 406; Chit. Eq. Dig. 806; 3 Equity Dig. 178; [Milligan v. Milledge] 3 Cranch [7 U. S.] 220; 1 Vern. 185. The bill assumes two grounds on which the equitable interposition of this court is asked: First, the public sale and the transactions growing out of it; and secondly, the three quarter sections purchased by the complainant and his associates, constituting the company first named, and which the bill alleges were transferred to Baum as trustee, for the exclusive benefit of the original purchasers. That these quarter sections were transferred without their consent or knowledge to the Michigan university, by the defendant, Oliver, in exchange for lots one and two; for which he obtained a patent in his own name. From the allegations of the bill, these quarter sections were wholly disconnected with the public sale objected to in the plea, and they are so treated in the plea. In bar of the right thus asserted, the defendants plead that an attachment was issued against the individuals composing the first company from the county court in Monroe county, in the territory of Michigan; by virtue of which these tracts of land were seized and sold to Noble, who afterwards conveyed the same to the defendant, Oliver. There is no denial in the plea that Oliver acted as agent in negotiating and effecting the exchange of lands with the university. No averment that the county court in Monroe county had jurisdiction over the lands, by the process of attachment, or that the proceedings thereon and the sale were regular. No exhibition of the record, nor any averment that the proceedings were valid. This is the more singular, as the legal proceedings took place, as stated in the plea, in the territory of Michigan; while the bill avers, as the truth is, that the land is situated in the state of Ohio. And it is asserted that the defendant, Oliver, was the plaintiff in the attachment, which fact connected with the subsequent proceedings, would seem to call for explanation. A presumption arises in favor of judicial proceedings of a court of general jurisdiction. But that presumption does not arise in this case, because the land is alleged to be in Ohio, which was sold under an attachment in the Michigan territory. Now if there were any facts going to give jurisdiction to the court in Monroe, they should have been specially alleged in order that the court might consider them; but the plea is general, and seems to take for granted that a judicial proceeding in a foreign jurisdiction, may dispose of land in Ohio. Suppose the same facts in regard to these quarter sections had been averred in a declaration, how would the plea in bar, now set up, be considered.

The plaintiffs allege that the defendant, while acting as agent, transferred and disposed of three quarter sections of land of great value, and refuses to account for the same. And the defendant pleads in bar that an attachment issued in Michigan territory, which was levied on the land, though situated within the state of Ohio; and under such attachment, the land had been sold; and that the purchaser had conveyed the same to the defendant. Is it an answer to the declaration? There is no denial of the agency—no affirmation that the judicial proceedings were before a court which had jurisdiction over the land. In 3 P. Wms., the bill charged fraud, and the defendant pleaded the statute of limitations, and denied the matters of fraud; but as there were some circumstances not fully denied, the defendant was ruled to answer. And in 3 Atk. 70, the bill charged that since the death of the intestate, the administratrix promised to pay as soon as she had effects. The administratrix pleaded the statute, and that she made no such promise; the plea was held to be too general. And in the same book (page 815) the defendant put in a plea of purchase for a valuable consideration without notice; but as the instances of notice charged in the bill were particular and special, it was held that a general denial was not good. That the denial must be as special and particular as charged.

These cases show that courts do not favor a plea in bar, which does not always present the merits of the case. And that where matters in bar are attempted to be set up, they must cover the whole equity of the bill; not by implication, but by express allegation. And if this be the rule, it is clear this plea is defective in not answering to the bill, the material allegations respecting the sale of the three quarter sections; and the averment in regard to the judicial proceedings has neither the necessary form nor substance, to constitute a bar. But the most conclusive objection to the plea is, that it is not accompanied by an answer, in support of the plea, denying the fraud charged in the bill, and other facts which show an equity in the complainant. This ground alone is fatal to the plea. 6 Ves. 594; 2 Ves. & B. 364; Mit. Eq. Pl. 298, 299; 2 Atk. 241; 1 Sim. & S. 568; 5 Brown, Parl. Cas. 561; 15 Ves. 397; Story, Eq. Pl. 497; 4 Sim. 161; 7 Johns. Ch. 214.

The overruling of the plea will not deprive the defendants from insisting on the same grounds in their answer, and in this mode the merits of the case may be more fully presented to the court. On the ground that the plea is defective it is set aside, and the defendants are ruled to answer the bill.

NOTE. Judge Burnet's name is used in the proceedings of this case; but it is understood that he has no interest in the controversy, and has taken no agency in the management of the suit.

[Subsequently, the defendants having answered, the cause came on for final hearing. An opinion was rendered in favor of complainants, but the case was referred to the master for an account of sales, money received, etc., in order to enable the court to enter final decree. Case No. 11,115. Upon reargument of the case this opinion was confirmed. Id. 11,116. After the case had been recommitted several times to the master, and reports filed by him, a final decree in conformity with the opinions above in Cases Nos. 11,115 and 11,116 was en-

tered. From this decree the respondents appealed to the supreme court. Mr. Justice Story delivered the opinion of the court, affirming the decree. 3 How. (44 U. S.) 333.]