# MANUEL V. DOMENECH, as Trustee in Bankruptcy of Compañía Azucarera de la Carolina and Compañía Azucarera de la Carolina, Complainants,

*v.*

# ENRIQUE GONZALEZ, Dft.

San Juan, Equity, No. 1053.

THE PRINCIPAL THING IN THIS OPINION IS SETTING ASIDE JUDICIAL SALE FOR FRAUD.

Setting Aside Sale—Tender of Amount.

1. Quære, whether the fact that the purchaser at the sale has made profits equal to the amount he bid can be considered as equivalent of tender thereof by the plaintiff in the case. Non constat he may have spent all his profits. The money in part must go to others on account of reorganization.

Accounting—Subpœna Duces Tecum.

2. In a bill for accounting a subpœna duces tecum cannot be used to prove the case before there is some independent evidence on the main issue, of fraud or otherwise.

Evidence—Letters.

3. Where one was a bondholder and had ceased to be such, his letters as bondholder in a suit affecting bondholders may be offered when against his interest.

Evidence—Consent as to Deceased.

4. Where an administrator of a decedent gives a general power of attorney, that attorney can consent to the admission of confidential communications.

NOTE.—On effect of preventing or chilling bids upon the validity of sales at auction, see note in 20 L.R.A. 545.

On validity of agreement to purchase property at judicial sale for joint benefit, see note in 38 L.R.A. (N,S.) 719.

On collateral attack on judicial and execution sales for inadequacy in price, see note in 1 A.L.R. 1443.

### Domenech v. Gonzalez.

**Mortgage Sale—Outside Agreement.**

    5. Where the price obtained pays other bondholders 70 per cent and the outside agreement secures to a syndicate par value, but there is no evidence the purchasing syndicate would have bid the difference, there is legally no chilling of the sale.

**Fraud—Inadequate Price at Public Sale.**

    6. Where the value of a sugar factory is uncertain under the evidence, a sale at a reasonable price will not be set aside.

**Mortgage Sale—Chilling the Sale.**

    7. An agreement between bidders which results in a lower price is fraudulent in law and will be set aside. This does not prohibit two men from agreeing to purchase together, nor is there any presumption that bidders will continue bidding. In the case at bar it would seem the purchaser would have paid $45,000 more, and that the other bidder wished to cover bonds in his possession amounting to $45,000 more; but there is no evidence that this bidder would have so continued bidding.

Opinion filed December 21, 1920.

*Messrs. O. B. Frazer* and *Miguel Guerra* for plaintiffs.

*Messrs. Cay. Coll y Cuchi* and *J. Henri Brown* for defendant.

HAMILTON, Judge, delivered the following opinion:

The bill in this case was filed originally on March 11, 1920, by Compañia Azucarera de la Carolina and was amended July 20th, 1920, Manuel V. Domenech as trustee in bankruptcy of that bankrupt concern having after various pleadings been added also as plaintiff. Answer to the bill, as amended, was filed August 7, 1920. The hearing was held on August 13th, 14th, 17th, 19th, and 23d. The object of the bill is to set aside

Domenech v. Gonzalez.

as fraudulent a mortgage sale on August 23, 1919, of the property known as the Central Progreso, belonging to the bankrupt Compañía Azucarera de la Carolina. This was held in the morning at the postmaster's office in the Federal Building. In the afternoon there was another sale of the unmortgaged property of the company. The bill seeks to set aside the morning sale at which the defendant Gonzálcz purchased the Central property for three hundred and thirty thousand dollars ($330,-000) on the ground that an agreement he made with another bidder, Riera, chilled the sale and caused the property to bring less than its reasonable value. The second sale is not within the case except incidentally.

It will be necessary to discuss first some matters of pleading, within the evidence, and last we take up the facts.

1. There is no question that in a proceeding to rescind a contract for fraud the plaintiff must offer to restore the consideration received before he can be granted rescission. This is the rule. Consumers Coal & Fuel Co. v. Yarbrough, 194 Ala. 482, 69 So. 897; 13 C. J. 621; Thurston v. Blanchard, 22 Pick. 18, 33 Am. Dec. 701. There are possibly some exceptions, and the plaintiff in this case seeks to bring himself within this principle by alleging that the defendant has made out of the property fraudulently acquired more than the three hundred and thirty thousand dollars ($330,000) which the plaintiff would be required to tender; therefore, there is no need of tendering anything.

It may be doubted whether this point is well taken. The defendant might have made much more than what he paid for the property, and on account of the changes in the sugar condition might not be worth that amount at the time the bill was filed or

at the time of the trial. The result of such a decree must be a proceeding setting aside the distribution of the fund among creditors and others. The case of a buyer and seller at an ordinary sale is not analogous, for in the case at bar others have become interested in the fund, and in fact have participated in its distribution. There has been a complete reorganization of the whole property, both the mortgaged and unmortgaged portions. It may well be that this does not oust the jurisdiction of this court to proceed and do justice, but it is a matter of grave doubt whether the plaintiff under these circumstances can excuse himself from tendering the proceeds of the sale which he now seeks to set aside. So far as the evidence shows, what was done was to raise a fund of four thousand dollars ($4,000) for the expenses of the proceeding by an assessment of one dollar ($1) per bond, relying upon the supposed profit made by defendant for the other needs of the case. Quare, whether this amounts to a proper tender.

2. It is certainly true, however, that there has been no adequate proof of such profit by the defendant. The plaintiff made no proof of this fact except to ask for a subpoena duces tecum for the defendant to bring in a balance sheet or account showing the profit he made. There was no allegation in the bill seeking an account, and the court denied the right to use a subpoena duces tecum for that purpose under such circumstances. It was said at the time and is now repeated:

"The proper procedure I take it is, on asking a subpoena duces tecum, I could right then and there go into the relevancy of it and grant it or not; but that is not paramount. Unless it is something that is obviously out of place, I always grant it, which would of course compel a party to attend with whatever

Domenech v. Gonzalez.

the information is, but if the subpœna, the writ, is improperly granted, it will be quashed upon argument. I take it that is what you have in mind at present.

A subpœna duces tecum has been issued, and certain papers brought into court. The defendant on introducing them, on their being called for, objects on the ground that the complainant must first prove the fraud before calling for an accounting of the proceeds of the fraud. The plaintiff offers the evidence on the ground that his bill states that the defendant has made more or as much as the amount that was bid in the purchase and that, therefore, it is not necessary for the plaintiff to make a tender, and he offers this evidence through that allegation, which was denied, so that the matter comes before the court in that way. It seems to me that the objection is well taken. It is true that the plaintiff has to prove what is denied. How far he can use the subpœna duces tecum in equity it is not necessary to discuss, but where an accounting is the main thing in a case, it has to be got at by allegations, not simply by motions in connection with the evidence, but by allegations of a particular sort. There is nothing of this sort in this bill. The plaintiff says there has been more profit than the amount of the bid, but he does not call upon the profiter to make an accounting in the matter. It is simply one allegation which can be proved, must be proved in some way, but not necessarily in this way. The case is somewhat analogous, of course not identical, to one in the case of Jewett v. Bowman, 29 N. J. Eq. 174. One of the headnotes is that where an account or any other relief is incidentally asked, if relief on the main ground is denied, the bill should be dismissed. That is not precisely this case, because there is no question just now of dismissing the bill, but it shows

that the two reliefs are independent, that the fraud in the case at bar, as in this Jewett case, the fraud is to be established before the accounting can be got at. If you take the pleadings in a bill for accounting, there are two decrees, if I recall the procedure. First there must be one for an accounting, and the second proceeding or the second part of the proceeding in which the accounting itself is provided for. Now, if that is true in a bill for accounting itself, it seems to me to be all the more so, a fortiori, where the accounting is incidental and one cannot turn a mere motion to introduce evidence into a bill of accounting, certainly not without following procedure in an accounting case. So it seems to me before we can have any accounting from the defendant at any time there must first be proof of the fraud, if you are going to establish a case of fraud by the defendant himself; whether or not the plaintiff can prove it in any other way, I cannot say. Of course, there is another consideration. I am very loath, the court should be very loath, to make the defendant, no matter who he is, disclose his private business,—a corporation is in the same position unless it is a public corporation,—unnecessarily. The secret, the essence of our modern civilization is that a man can conduct his business in his own way and not be exhibiting it to others. Now, of course, this must yield to court needs wherever there is any regular proceeding to that effect. A man must show his business, what he has done, if it is a part of the issue, but I think when it comes to an accounting, we must follow the ordinary rules of accounting, and I think it would be stretching them considerably to get at the evidence in this particular way. So the objection to the production of the evidence is sustained."

There is no proof in the case of a tender or its equivalent.

Domenech v. Gonzalez.

There was not even an offer to amend the pleadings so as to turn it for this purpose into a bill for an account, and thus obviate the difficulty.

3. This would dispose of the case, but for greater certainty the other matters involved will also be discussed. Thus as to evidence, an important point was connected with certain letters written by José D. Riera, formerly a receiver in this court of the Central "Progreso" in question, and intimately associated with the whole matter as bondholder and otherwise. It would seem that he and the defendant were bidders at the morning sale, when defendant was successful. The basis of the bill is that Riera and defendant González made an agreement in consequence of which Riera retired and González became the successful bidder. The testimony of González was taken in the case, and it is possible much light could be obtained from Riera, had he lived. He died before the bringing of this suit and letters of his written to Fabián, a San Juan capitalist then absent in Spain, were offered by the plaintiff. The first dated August 24, 1919, was admitted without objection. The later ones although of the same series were objected to by defendant when offered by plaintiff.

The substance of the letters objected to, as of those admitted, was to the same effect, and it is difficult to separate them. They were all directed to a friend of Riera's whom he was trying to interest as a partner in the transaction, and consisted of Riera's version of what happened at the sale and afterwards in connection with the matter of litigation. As they were Riera's version of what happened when he was interested as a bondholder, and were offered after his interests had become adverse to those of the bondholders, it would seem that they are against

interest and therefore admissible. There is no question that where a man is dead, his statements against interest can be used, even against him. Greenl. Evi. § 147; Drummond v. Prestman, 12 Wheat. 515–522, 6 L. ed. 712–715; Porto Rico Law of Evidence, §§ 35 and 93. It would seem, therefore, that the letters were properly admitted.

4. The defendant's present attorney, Mr. Cayetano Coll y Cuchi, acted at the sale as attorney for Riera and is offered by the present defendant in this suit to throw light upon Riera's actions at the sale. This involves divulging confidential communications passing between Coll and Riera as attorney and client. There is, of course, no question that communications between lawyer and client are privileged and cannot be testified to by either to the prejudice of the other. The point was not distinctly raised by counsel, and the court suggested it. Thereupon one Macías, brother of the widow, was introduced. It was admitted that the widow was the legal representative of the estate under the provisions of the civil law, and it was shown that the widow had given Macías a general power of attorney to represent the estate in all respects. Macías when recalled testified as representing the estate that there was no objection to the use of the letters in this case. It would seem, therefore, that there was no error in their admission, if indeed the consent as to admission of the keynote letter did not authorize either side to use the whole connected series.

5. Coming now to the merits of the case, the question is whether the agreement shown to be made between Riera and the defendant came within the principle as to what is called "chilling the sale." That agreement as translated is as follows: "We agree to cover two hundred and forty-eight (248) bonds

of the Syndicate to its full value, provided that Riera or the syndicate do not offer (or 'bid' is a more proper translation), do not bid for the second lot, plus the expenses made, and it is guaranteed that the bank will obtain what is due for the bonds."

There is no doubt that any agreement between bidders which results in there being a lower price secured for property at public sale then would have been secured without such agreement is fraudulent in law and upon due application such sale will be set aside. There has been a great deal of consideration of the principle, and the decisions are not always uniform. Even an agreement of two men to buy a piece of property together was held void in 4 Cowen, 732, itself going upon the principle of the old English cases of Howard v. Castle, 6 T. R. 642, 101 Eng. Reprint, 748, 3 Revised Rep. 296, and Bexwell v. Christie, Cowp. pt. 1, p. 395, 98 Eng. Reprint, 1150.

Careful consideration of the principles of later cases, such as Investment Registry v. Chicago & M. Electric R. Co. 204 Fed. 500; Fletcher v. Johnson, 139 Mich. 51, 111 Am. St. Rep. 401, 102 N. W. 278; Piatt v. Oliver, 1 McLean, 295, Fed. Cas. No. 11,114; Kearney v. Taylor, 15 How. 494, 14 L. ed. 787; Mallon v. Buster, 121 Ky. 379, 123 Am. St. Rep. 201, 89 S. W. 257, and the like, established the principle that while any conduct on the part of bidders which prevents free competition is contrary to public policy, there is no reason why persons who otherwise could not bid should not agree to purchase property together. The object of the law is to make sure that persons shall bid freely, so that the property will bring the most for creditors or for the debtor as the case may be. It is not within the reason of the rule, and it would be impossible to expect that

Domenech v. Gonzalez.

people must bid whether they wish to do so or not, that everyone present at the sale must contribute to run up the price of the property. If proper notice has been given, and of that there is no question in the case at bar, and the public is well represented, the fact that two particular bidders do not care to continue bidding against each other beyond what their interests dictate is no concern of anyone else.

In the case at bar the evidence seems to show that Riera and other bondholders had a plan to buy the mortgaged property and reorganize the Central, as had been done in another judicial sale in this court. To that end several of them formed a syndicate controlling two hundred and forty-eight (248) of the four hundred (400) bonds of the company, and Riera represented the syndicate. Defendant González on the other hand wished to buy the property as a business venture. The two had some conversation before the sale, and bid against each other at the sale for some time. González' bid of three hundred and twenty thousand dollars ($320,000) was raised by Riera to three hundred and twenty-five thousand dollars ($325,000). Riera seems to have thought that the property was worth about three hundred thousand dollars ($300,000). González seems to have been willing to go higher provided he was secured against paying too much for the railroad and other unmortgaged property which would be sold in the afternoon. Through the activity of Riera's attorney Coll, the above agreement was made in writing and signed by Riera and González and also by one Rubert. The paper seems to have been signed after Riera had bid three hundred and twenty-five thousand dollars ($325,000), which was possibly his highest bid as he hesitated about making it, and after González had raised him five thousand dollars

Domenech v. Gonzalez.

($5,000) more, an adjudication was about to be made to González, the auctioneer having pronounced the words "One!" "Two!" and possibly "Three!" The adjournment was had at this point at the request of attorney Coll, and the paper was signed. Thereupon the auctioneer made his final announcement and awarded the property to González.

The effect of the agreement was first that the syndicate bonds were covered, that is to say, it seems that González paid Riera forty-five thousand dollars ($45,000) to make these two hundred and forty-eight (248) bonds bring par. The other bondholders got about seventy per cent (70%). The agreement otherwise related to the sale in the afternoon, which, however, is not attacked in the bill and must for the purposes of this case be considered as having brought a full price. It was confirmed without opposition and is not opposed now.

There was no "chilling of the sale" so far as the public was concerned. The only question is, Would Riera have gone higher in his bidding with González but for the agreement?

6. Fraud is not presumed and must be proved by the person alleging it. 25 Cyc. 13. This is as true in equity as by express provision of the Civil Code. Conard v. Nicoll, 4 Pet. 291, 7 L. ed. 862. In order to prove that this sale is fraudulent the plaintiff must show that the defendant made representations, false and known to be so to the defendant, that they were made to be acted upon and were acted upon, and that the plaintiff was injured thereby.

The bill alleges that the property was worth about a million dollars ($1,000,000) and that the sale for three hundred and thirty thousand dollars ($330,000) was totally inadequate. To the price of the morning sale of course is to be added that of the

XII. Porto Rico.—9.

afternoon sale, to wit, one hundred and nine thousand dollars ($109,000), in order to get at the value of the property as a whole. We are concerned, however, only with the morning sale. There is evidence of several witnesses that the property was worth from six hundred to twelve hundred thousand dollars, and there is no doubt that it is difficult to value Central property. The Central consists not only of the machinery, whose value depends upon its make as well as upon its age and condition, and upon the supply of cane, itself varying between ownership of lands by the Central and cane contracts with colonos. There is to be added to this, water supply, railroad facilities, and many other things. What is true of one Central might be notoriously untrue of one a few miles away. The condition of the sugar market also is an important factor. A Central may be up-to-date and have all facilities for acquiring and grinding cane, and if the price of sugar is low, the investment may be worthless. This particular quality of value has been marked within the past six months.

The Central had made ninety thousand dollars ($90,000) from the preceding crop while in receivership in this court, and it was argued that it must therefore have been worth something like nine hundred thousand dollars ($900,000). There is some testimony tending to show that the receivers used the property for all it was worth and what they left to be sold was in bad condition. The defendant's testimony is that the receivers, to use a railroad expression, knew the value of the scrap heap, and worked the property for all it was worth regardless of the condition they left it in.

Perhaps the best basis of value may be found in a projected sale of the property in 1919, when an attempt to sell it to

Domenech v. Gonzalez.

Bianchi for seven hundred thousand dollars ($700,000) fell through. It would seem that at this time the stockholders thought the property was managed for the benefit of a creditor, with the result that no dividends were paid, and negotiations were therefore undertaken for a sale. This was during the War, sugar was in demand, the property was in running order, and in January in the midst of the grinding season, with profits which would come from the crop, as well as necessary supplies of various kinds. These elements may have amounted to several hundred thousand dollars.

7. The fact remains, however, that Riera stopped bidding and thereby secured the covering of the syndicate bonds. This he says in one of his letters amounted to an additional amount of forty-five thousand dollars ($45,000). That he would have continued bidding the property up to four hundred thousand dollars ($400,000), so as to cover all the bonds at par, there is not the slightest evidence. There is not the slightest evidence that anyone else would have done anything of the kind, for all others had stopped bidding long before. There is in the case only the bare fact that he did make an agreement with González by which the sale stopped and he secured for his people forty-five thousand dollars ($45,000), apparently from González. In other words, that González would have bid forty-five thousand dollars ($45,000) more if that would have secured the property. There was nothing to compel González to pay that much more, however, unless Riera had continued to bid. The conclusion which the court draws from the facts is that González might have paid forty-five thousand dollars ($45,000) more, but that there is no evidence Riera would have forced him to do so, and certainly no one else would have done so. The evi-

Domenech v. Gonzalez.

dence fails, therefore, to show that a higher price would have been secured but for the agreement made. Further evidence might induce a different conclusion, but upon the facts as they now stand there is no satisfactory testimony that the sale was chilled by the agreement complained of.

The court certainly would not order a resale without some assurance that a materially larger amount would be secured. There is no evidence of that in the case. However, this may not be material inasmuch as the case must fail on other grounds.

It follows that the bill must be dismissed, and it is so ordered.