CASE No. 823.

BARRETT v. BATH PAPER COMPANY.

1. Certain parties, desiring to purchase property in which they had no interest, soon to be sold by the sheriff under executions, entered into an agreement with some of the judgment creditors, that if the property was sold to them for less than enough to satisfy such judgments, they would pay the balance due and take assignments of the judgments; and they afterwards purchased the property at an inadequate price. *Held*, that this agreement was an interference with full and free competition; and the sale was set aside.

2. If anything tending to prevent the sale from having its full efficacy for the benefit of the vendor is done by the purchaser, such conduct is a fraud on the rights of the vendor, and vitiates the sale. *Cases cited.*

3. The intention to interfere with full competition constitutes the fraud that vitiates the sale; and such intention may be shown by express proof, or may be inferred from an agreement whose tendency is to produce that result.

Before KERSHAW, J., Aiken, April, 1879.

The case is fully presented in the Circuit decree, which is as follows:

This case came on to be heard at the February Term of the Court of Common Pleas of Aiken county, but there not being time to conclude the hearing, the same was concluded by consent of counsel in April, after the courts of the Second Circuit were over. The necessity of completing the business of that Circuit held under advisement, and the early commencement of the courts

of the Third Circuit having conspired to prevent an earlier decision at all comporting with the gravity of the issues involved, and the very protracted and the exhaustive arguments presented by the counsel on either side.

The facts, as I find them, so far as necessary for this decision, are as follows:

The defendant, the Bath South Carolina Paper Mill Company, was duly incorporated in the year 1869, under the provision of the general act of incorporation, passed December 30th, 1866, (13 *Stat.* 403), and failed to make the annual reports in accordance with the requirements of said act.

On June 11th, 1877, J. Morton Poole & Co. obtained a judgment in Aiken county, against the Bath South Carolina Paper Company for $2292.37, founded upon two promissory notes, bearing date May 1st, 1876. This judgment was duly entered, and on July 9th, 1877, was assigned to James Barrett and James P. Boyce, defendants; the former being president, and the latter a director and stockholder of the Bath South Carolina Paper Company. On June 7th, 1878, execution was taken out on said judgment and levied the next day on all the property of the defendant company, real and personal.

On February 16th, 1878, Gilreath & Peoples obtained a judgment against said company for $762.55, founded on causes of action dated June 28th, 1877. This judgment was duly entered at Aiken, execution issued thereon February 18th, 1878, and a levy was endorsed July 8th, 1878, of all the property of said company. The same day, February 16th, 1878, N. F. Burgess & Co. obtained a judgment against said company for $778.36, on causes of action dated June 28th, 1877, duly entered the same at Aiken, took out execution thereon February 18th, 1878, and a levy was endorsed thereon July 8th, 1878, of all the property of said company.

On April 19th, 1878, the Goodyear Rubber Company obtained a judgment against said Bath South Carolina Paper Company for $162.23, on a cause of action originating September 10th, 1877. Judgment was duly entered, and execution issued thereon April 19th, 1878, on which a levy was endorsed July 8th, 1878, of all the property of the defendant company.

I

On April 10th, 1878, Poole & Hunt obtained a judgment against the said company for $2086.50, in a cause of action arising in part July 9th, 1877, and the remainder August 3d, 1877. Judgment was duly entered thereon, execution issued April 19th, 1877, and a levy was endorsed thereon July 8th, 1878, of all said company's property.

H. Waterbury & Co. obtained a judgment against said company June 8th, 1878, for $178.09, on a cause of action dated August 1st, 1877. The judgment was duly entered and execution issued thereon June 27th, 1877, and a levy was endorsed thereon July 8th, 1878, of all the property of said defendant company.

On the same day, June 8th, 1878, the same parties obtained a judgment against said company for $199.32, on a cause of action arising September 26th, 1877. Judgment was duly entered and execution issued thereon June 27th, 1878, upon which a levy was endorsed July 8th, 1878, of all of said company's property.

M. Goldsmith & Son filed in Aiken county, June 15th, 1878, a transcript of a judgment in their favor against said company, obtained at Charleston, for $576. Executions were issued thereon the same day, upon which a levy was endorsed July 8th, 1878, of all defendant's property, and the same was returned *nulla bona.*

M. Goldsmith & Son, on the same day, June 15th, 1878, filed another transcript of a judgment in their favor against said company, obtained at Charleston for $577.38. An execution was issued thereon the same day, and a levy endorsed July 8th, 1878, of all the said company's property, and the same was returned *nulla bona.*

All these judgments, except those of Waterbury & Co. and Goldsmith & Son, were obtained by D. S. Henderson, Esq., as attorney for the several plaintiffs therein. The first, that of J. Morton Poole & Co., having been assigned to James Barrett and James P. Boyce, passed out of the control of Mr. Henderson, as attorney.

About May, 1878, the said Henderson examined the affairs of the Bath South Carolina Paper Company, with a view to ascertain how the money could be made for his clients on their several

judgments. In doing so he discovered a condition of things indicated in the following facts:

The Bath South Carolina Paper Company had failed to make the returns required by the charter, and, as a consequence, Mr. Henderson regarded the officers and directors of the said company as individually liable for the debts of the same.

The board of directors of said company, on September 4th, 1871, adopted a resolution to the effect that the president be authorized to have prepared twenty coupon bonds of the denomination of $1000 each, bearing interest at the rate of ten per cent. per annum, payable semi-annually to bearer, at the National Bank of Augusta, and that he be authorized to dispose of said bonds at not less than par, and in such amounts and at such times as may be necessary to meet expenses of repairing the dam. The bonds to be made payable as follows: $4000 in three years, from September 1st, 1871, and the like amount in each year thereafter. The bonds and coupons to be signed by the president. October 30th, 1871, at a meeting of the board of directors of said company, the president was authorized to execute a first mortgage to W. H. Barrett and Robert A. Fleming, as trustees, for the sum of $20,000, to secure the payment of the bonds and interest authorized to be issued by the board of directors, at a meeting held September 4th, 1871. The mortgage was read and ordered to be spread upon the minutes.

At a meeting of said board of directors, held January 5th, 1872, the president stated that some objection had been made to the mortgage, and the matter had been referred to the attorney to arrange with Mr. Miller, the attorney of the bank, and reported at an early day, and it was resolved that the president be authorized to sell the bonds at his discretion for such price as he may be able to get. Under this mortgage sixteen bonds were issued, of $1000 each, making a total of $16,000 of the first mortgage bonds. This mortgage was executed in the presence of two witnesses and recorded, but was never proved for record, as required by the statutes. This, together with the fact that the same was made by order of the directors, without any vote of the stockholders upon the subject, induced the belief upon the mind of

Mr. Henderson that the mortgage was not a valid lien on the property of the Bath South Carolina Paper Company.

At a meeting of the stockholders of said company, held at Augusta, Ga., May 19th, 1874, the president was authorized and instructed to prepare fifty coupon bonds of $500 each, dated February 24th, 1874, payable in ten years after date to bearer, and bearing interest at the rate of ten per cent. per annum, payable semi-annually, to be signed by the president and known as the second mortgage bonds. The president was instructed to execute a second mortgage to John M. Clark and John Craig, or to any other two stockholders, for the sum of $25,000, to secure the payment of the said second mortgage bonds. The president was authorized to dispose of said bonds at such times and at such amounts as he might deem best, but they were not to be sold for less than par, except by the advice and consent of a majority of the board of directors. It was declared the true intent and meaning of the resolution that the first mortgage bonds should be paid at maturity by the proceeds of the second mortgage bonds and other receipts of the company. The second mortgage was signed by the president, in the presence of only one attesting witness, bears date May 19th, 1874, and was promptly recorded in the proper office at Aiken, but does not appear to have been approved for record by the subscribing witness. Thirty-one bonds were issued under this mortgage, aggregating the sum of $15,500. Mr. Henderson was of the opinion that this mortgage constituted no valid lien on the property of the defendant company.

Messrs. Barrett and Boice, assignees of the first judgment against the company, having caused a levy to be made on all the property of the defendants on June 8th, 1878, and Mr. Henderson having satisfied himself that the company would or could not make arrangements for the payment of the judgments under his charge, as attorney determined to inform his clients of the condition of things, so far as known to him. He accordingly wrote all his clients as aforesaid, except the Goodyear Rubber Company, stating the fact that a levy had been made, and expressing his opinion that the first and second mortgages were not valid liens on the property, and proposing two alternative courses

which could be pursued to secure the payment of their judgments, in these words : " *First.* The property, if free from encumbrances, is very valuable, and I am trying, and very hopeful, too, to get a parcel of moneyed gentlemen, upon my opinion, to risk the purchase of the equity of redemption, in July, at a price suffi- cient to pay up all our claims, and then to fight the mortgages. If this succeeds we will be all right; otherwise, we must act for ourselves. *Second.* And then I ask the authority of our clients to file a bill on the equity side of our court to set aside and de- clare void the mortgages, and restrain the selling until the case can be tried at the September Term. The other judgment credi- tors will aid us. You will immediately perceive the situation and the necessity for a prompt reply in order to enable me to get a temporary injunction before sale-day." To this he added : " I need not impress upon you the necessity of the secrecy of my views, especially from any one, agent or otherwise, in the interest of the Bath company." He also stated in effect that the other judgment creditors would aid them in these proceedings, as will be seen.

On June 19th, 1878, Messrs. Hill & Hill, attorneys on behalf of Poole & Hunt, replied to this letter, giving Mr. Henderson authority to file the bill as suggested by him, but expressing the hope that he would succeed in getting the gentlemen referred to to purchase the equity of redemption, &c.

N. F. Burgess & Co., controlling their own judgment and that of Gilreath & Peoples, replied to Mr. Henderson : " We do not wish to incur much expense in the matter, but we are willing to join other creditors in the necessary steps to levy and make our money. So you may proceed with the temporary injunction, and we can await developments, and, of course, stop proceedings at any time we think best. We are decidedly in favor of taking the first step in the matter, and hope you will proceed to do so at once. We think by doing so the matter may be settled. Will write you more fully soon. Hope you will make our money *if possi- ble.*" There was some controversy as to the meaning of the ex- pression in this letter, " the first step." Reading it in the light of surrounding circumstances, and with the letter of Mr. Hender- son, to which it is a reply, I think the meaning is plain. That

letter proposed two courses, either of which might be pursued, numbering them *first* and *second.* The first was the scheme to form a party to buy the equity of redemption. The second, to institute proceedings to procure an injunction, and asking authority to take that step if the first should not succeed. Replying to this, Burgess & Co. gave the authority asked for in the second proposition, but added: "We are decidedly in favor of taking the first step in the matter, and hope you will proceed to do so at once." It appears quite evident that the reference was to the first proposition made in the letter to which the writer was replying. This view is strengthened by the testimony of Mr. Gilreath, the writer, who says he told Mr. Henderson in a personal interview before the sale, "that he would much prefer to get a party to buy it." Mr. Henderson is, therefore, to be regarded as having the authority of his clients (except the Goodyear Rubber Company) to pursue that course in their behalf.

Mr. W. W. Williams represented, as attorney, the two judgments of Waterbury & Co. against the Bath South Carolina Paper Company. He consulted with Mr. Henderson about taking the judgments, and as to how the money could be made thereon for his clients. Subsequently Mr. Henderson communicated to him, under injunctions of secrecy, his discovery of the defects in the mortgages, and his plan for securing payment of the judgments which he represented, and promised Mr. Williams that if he succeeded in getting his money Williams should get his. Mr. Williams relied on this promise and Mr. Henderson's scheme, and made no further effort to secure the payment of the judgments in his charge.

Mr. Henderson continued his efforts to make up a company to buy the property, upon his opinion of the invalidity of mortgages. At the instance of Mr. Sibley, to whom he had proposed the scheme, C. Richardson Miles, Esq., of Charleston, attorney and counselor-at-law, was consulted, and gave an opinion concurring with that of Mr. Henderson on the subject.

On June 24th, 1878, Mr. Henderson discovered a third mortgage. Its history is as follows:

At an extra or called meeting of the Bath South Carolina Paper Company, held at Bath, South Carolina, February 18th,.

1877, it was resolved that the president be empowered to issue a mortgage, to be known as the new first mortgage on the mill property of the company, to the amount of $60,000, with one hundred and twenty bonds, of $500 each, to H. H. Hickman and John M. Clark, as trustee. Said mortgage bonds to be issued as follows, to wit: Bonds No. 1 to 32 inclusive, in exchange or payment of the outstanding first mortgage bonds of the company, amounting to $16,000, and the remainder, from No. 33 to No. 82 inclusive, to be paid in exchange for or payment of the issue of $25,000 of second mortgage bonds, and the remainder, from No. 83 to No. 120, to be delivered by the trustees, at par, for the proportionate share of the assessment, to such stockholders as should accept the proposition made at that meeting to pay a further amount of fifteen per cent. upon their stock in the company in exchange for such bonds. Power was denied to the trustees and directors to use said bonds for any other purpose than as above, and the bonds were to bear interest at ten per cent. per annum, payable semi-annually, and the principal was to be payable April 1st, 1888, to the parties who had accepted or should accept, previous to March 15th, 1879, and agree to pay the assessment of twenty-five per cent. on the stock of the company made April 19th, 1876, to whom should be issued preferred stock. These should be delivered for all sums of such stock which should be presented in multiples of $500, or for all further payments on said assessment bonds at par of the $25,000 second mortgage bonds of the company, for which they should receive at par value the bonds of the new issue of first mortgage bonds authorized at that meeting as above.

A further assessment was made of fifteen per cent. on the par value of the stock, and to such of the stockholders as should agree to pay the same in cash, bonds of the new mortgage should in like manner be issued, as provided for the assessment of the twenty-five per cent. of April 19th, 1876. The stockholders who accepted the assessment of April 19th, 1876, should be called on to pay the same prior to April 1st, 1877, and should be charged interest from the time the assessments were due, and interest allowed on all assessments due. That the additional

fifteen per cent. required should be payable, five per cent. May 1st, 1877; five per cent. June 1st, 1877; five per cent. July 1st, 1877. Due regard was to be paid to the interest on the assessments, and the exchange bonds, which were to be allowed at the rate of ten per cent. per annum. The parties agreeing to the several assessments were to have the right, if they desired it, to take preferred stock instead of the new bonds for their assessment. The trustees of the new bonds should have authority, by the joint concurrence of the stockholders and trustees, in the opinion that it was best for the interest of the company to sell the bonds from 83 to 120, or so much of them as should not be taken up by the fifteen per cent. assessment, provided such sale should not be below par, for cash, but they were not to have power, nor should the directors or stockholders have power to hypothecate the same.

The mortgage thus provided for was executed by the president of the company in the presence of two witnesses and acknowledged and subscribed before a trial justice of Aiken county, June 29th, 1877, and so certified by the trial justice, without further probate, was recorded in the proper office in Aiken county. Seventy-two bonds of $500 each were issued under this mortgage.

As soon as discovered by Mr. Henderson this mortgage was also submitted by him to Mr. C. R. Miles, who pronounced it "no better than the other two."

Mr. Henderson then went to Augusta and had an interview with the parties with whom he had been negotiating for the purchase of the Bath Mill Company. He told them that his clients did not wish to buy the property. That he wished to secure their money first. That if they desired the property they could bid on it as they saw fit; but that if they purchased for a less sum than the judgments represented by him amounted to, they must pay said judgments in full, which it was agreed were to be assigned to them after such payment, in so far as they should not be satisfied by the sale. The judgments of Waterbury & Co., represented by Mr. Williams, as attorney, were not mentioned by name, but were included in the amount estimated to be required to pay said judgments. A calculation was made

and it was ascertained that the enterprise would cost an outlay of money of $7000 or $8000.

Mr. Henderson, when asked what would be his charge, said he was willing that it should be contingent; said that he would charge one-ninth and in no case less than one-tenth. They then agreed to go into the matter. Mr. Langley took three shares, Mr. Sibley one, Mr. Bailie one, Mr. Schneider two, Mr. Foster one, Mr. Hack one. The money was provided for the purpose and Mr. Henderson was instructed to bid up to $10,000, but not to be restricted to that if he could get the property for $2000 or $3000 more.

A day or two before sale-day in July, Mr. Gilreath, of Gilreath & Peoples and Burgess & Co., visited Aiken and conferred with Mr. Henderson on the subject of the sale. He was informed confidentially of the arrangement that had been made to purchase the property and was assured that his debts would be paid in full. Gilreath asked Mr. Henderson if he had levied under his execution. Mr. Henderson replied that he had not. Mr. Gilreath expressed the wish that he should not so levy. Mr. Gilreath asked what would be done if the sale was put off in July. Henderson explained that in that case he could levy under the other executions. Gilreath said he did not want to levy, but he wanted his money. He did not wish Barrett to think he was the one pushing.

The sale was not made in July, Messrs. Barrett and Boyce having directed its postponement. Their attorney instructed the sheriff to advertise the property again under their execution, for sale-day in August. In order to be sure that the sale should go on at that time, Mr. Henderson directed the sheriff to levy under all his executions, which was accordingly done. The sheriff prepared the advertisement, submitted it to Mr. Henderson, and asked if that was sufficient. Henderson replied, "yes." The advertisement was in the usual form, headed as follows:

James Barrett and James P. Boyce, assignees of Morton Poole & Co., and others *v.* The Bath South Carolina Paper Company. Executions. It commences: "By virtue of the above executions now on file in this office, I will sell," &c., describing the property by metes and bounds. This advertisement was published

in the county newspaper, as required by law, but notice of the sale was not anywhere posted.

On Saturday, August 3d, the personal property of the Bath company was sold by the sheriff, and the proceeds credited upon the execution of Barrett and Boyce.

On sale-day in August, being Monday, 5th, Mr. Henderson received, before the sale, a telegram from Burgess & Co., instructing him to make the property bring enough to cover their debts, about $1400.

At the sale the sheriff read the advertisement to the assembled crowd. Mr. Croft, attorney for Barrett & Boyce, gave notice of the withdrawal of the authority to sell under their execution. Mr. Henderson instructed the sheriff to proceed to sell under the other executions. Mr. Boykin Wright, attorney for the mortgagees, in their behalf then gave notice of the three mortgages above described, by their amounts and dates, to the sum of $60,000, and also of a royalty claimed to be due of about $15,000, and gave notice that the sale would be made and the purchaser would take subject to the mortgages. The sheriff then got the junior executions and read the title of each. Mr. Henderson then said to the sheriff, "Proceed." Mr. James Aldrich, attorney, had been before consulted by the sheriff, and advised him that he must sell the equity of redemption. The sheriff had also received instructions from Mr. Smythe, the attorney for Goldsmith & Son, to proceed to levy and collect their executions, if he could find any property of the defendant. When instructed by Mr. Henderson to proceed, the sheriff gave notice that he would proceed to sell the equity of redemption, "whatever was left after satisfying the mortgages." The sale then proceeded.

The first bid was $20, by Mr. H. H. Hickman, bidding for Barrett & Boyce, Mr. Henderson acting as the agent of the company which he had organized to purchase; and Mr. Hahn, a merchant of Aiken, also bid, the latter stopping at $2800. Mr. Hickman's last bid was $4600. Mr. Henderson bid $4605, and the property was knocked down to him at that price. It was worth from $60,000 to $100,000. The sheriff was of opinion that if the terms were properly understood, it would bring

$75,000.   By direction of Mr. Henderson the bid was put down to William C. Langley, D. B. Hack, James G. Bailie, William C. Sibley, M. F. Foster and E. R. Schneider.   Mr. Henderson gave his check for the amount, and the sheriff thereupon duly executed a title deed to the purchasers for the entire property in fee, and the same was duly delivered on the day of sale.  The money was applied to the executions in the order of their priority.

The executions of Barrett & Boyce, Gilreath & Peoples, Burgess & Co., and the Goodyear Rubber Company, were paid in full.   That of Poole & Hunt was only partially paid.   The balance of this judgment and those of Waterbury & Co., were afterwards paid in full by the purchasers, and were assigned to them.

As assignees they commenced an action against James P. Boyce, as the director of the Bath South Carolina Paper Company, to charge him personally with the amounts due in said judgments, on account of the liability created by the charter against the officers and directors of the company for failing to make the annual report required, and have attached the interest of Mr. Boyce in the stock of the Graniteville Manufacturing Company.

The first mortgage trustees, W. H. Barrett and Robert A. Fleming, have instituted this action, making parties the Bath South Carolina Paper Company and the judgment creditors, the trustees under the other mortgages, the purchasers of the real estate, (except Mr. D. S. Henderson, who is not a party) and some of the holders of the bonds issued under the several mortgages.   The complainant alleges, *inter alia,* that all the said creditors of the Bath Paper Company had actual and express notice of plaintiff's mortgage before giving credit to the company ; that no other execution was levied on the said real estate ; and that of Morton Poole & Co., assigned to Barrett & Boyce, and no other execution, was specified in the publication of notice of said sale.   That authority to sell under the first-named execution was withdrawn, and the sheriff entered levies, and without change of notice in publication, proceeded to

sell the said property, the purchasers and the attorneys of the judgment creditors who participated in the benefits of said sale, having notice of said facts. Recites the combination of the purchasers, substantially as hereinbefore stated, and alleges that it was formed for the purpose of preventing said property from bringing its full value and being fairly bid in at said sale. Alleges that the property was reasonably worth $100,000. Recites the circumstances of the sale, the announcement of the liens by Mr. Wright on their behalf, the announcement of the sheriff that he would sell the property subject to the mortgages, and Mr. Henderson's silence thereupon; and alleges that all the bidders at the sale, except Mr. Henderson, bid with the understanding that only the equity of redemption was selling. That the purchasers now claim to hold the property free from any liens, and that the Bath South Carolina Paper Company owns no other property, and unless the said sale is set aside the mortgage bondholders would lose their entire debt.

The plaintiffs pray that the mortgages be foreclosed, and the equity of redemption be barred against all defendants; that the premises be sold and the proceeds applied to the payment of said mortgage debts, according to the rights of said bondholders, and execution awarded for the balance against the Bath South Carolina Paper Company; or, if the court finds the mortgages to be not valid, and existing liens on the property in the hands of the purchasers, it is alleged that the sale is irregular, void, and in fraud of the rights of the plaintiffs, the mortgagees, the bondholders and all their creditors, and pray that the sale be declared void and another sale decreed, and for further relief.

The answer of the purchasers denies the execution and validity of the mortgages; denies that the judgment creditors had notice of the mortgages, and claim as purchasers for valuable consideration without notice; they deny all illegal or improper motives or acts attributed to them, give their own version of the facts, affirm that the junior executions were duly levied on the property, and that the sale was duly and regularly made. They pray that the deeds set forth in the complaint be adjudged invalid, null and void, and that they be delivered up and canceled, and for further relief.

The judgment creditors, whose debts are paid, answering, state that fact, and claim that they are not necessary or proper parties, and adopt the answer of the purchasers. The others, whose judgments were assigned, claim that they are not necessary or proper parties, and adopt the answer of the purchasers.

Goldsmith & Son deny the validity of the mortgages, and deny notice of them. They admit the purchase at sheriff's sale; say that the price is grossly inadequate; that the bidding was chilled; that there were unlawful combinations affecting the sale, and the conduct of Henderson, Williams and the purchasers, operated as a fraud against said Goldsmith & Son. They aver that the property sold constitutes the entire property of the Bath South Carolina Paper Company. They pray that the complaint be dismissed, so far as it seeks for a judgment of foreclosure, that the sheriff's sale be rescinded, that the purchasers render up their title deed to be canceled, and that the premises be re-sold, and for further relief.

Messrs. Barrett and Boyce admit the allegations of the complaint in respect to the mortgages; admit that they had notice of them, and that all the judgment creditors had notice, as alleged in the complaint. They allege that the transactions of Mr. Henderson, the judgment creditors and the purchasers, had the effect of depreciating the property and forcing the sale at a grossly inadequate price. They ask that the sale be set aside as fraudulent, null and void, tendering back the money received by them, praying a sale for foreclosure of the mortgages, and for further relief.

The answer of John M. Clark, trustee of the second mortgage, is accompanied by a renunciation of the trusteeship of his co-trustee, John Craig, dated September 2d, 1878. The answer admits the allegations of the complaint, and prays for such relief as may be proper. The answer of the trustees of the third mortgage is to the like effect.

The answers of the bondholders admit the allegations of the complaint, set up their bonds as held by them *bona fide* and for value, and pray for a foreclosure of the mortgages and a general judgment against the company, and for further relief.

The evidence does not satisfy me that any of the judgment creditors were affected with notice of the mortgages.

There are other facts in evidence, but the foregoing statement contains all that I deem necessary or material to the determination of the issues involved.

Upon these facts I conclude as matter of law—

*First.* That neither of the said mortgages constitutes a legal and valid lien on the property described therein.

*Second.* That they are valid and binding agreements for mortgages, which will be enforced as such against the defendant company.

*Third.* That the sale made by the sheriff of Aiken county of the real estate of the Bath South Carolina Paper Company on August 5th, 1878, is rendered null and void by the circumstances attending it.

*Fourth.* That the Bath South Carolina Paper Company, the stockholders thereof, the bondholders, and the unpaid creditors, are entitled to be relieved against said sale and to a re-sale of the property, and a distribution of the proceeds thereof, according to their several priorities and equities.

The invalidity of the liens of the mortgages having been conceded by all parties at the hearing, as well as conclusively established by the argument of the counsel representing the purchasers, it is unnecessary that I should sustain the conclusion of law on that point.

The other conclusions arrived at are forced upon me after a protracted and careful review of the facts and the arguments of counsel, and an examination of most of the numerous authorities cited, as well as others not cited at the hearing, and I proceed to give some of the reasons for the judgment I have formed.

The grounds upon which a public sale may be set aside are those of fraud, mistake or public policy. Nothing will be permitted to interfere with the fair competition, which is the life of such a sale; and especially of a sheriff's sale, which is compulsory, under the authority and protection of the court, and in regard to which all parties are held to deal at arm's length. It has been well said that in every public sale, as there are but two leading interests, so there are but two parties—those engaged in

vending and those proposing to purchase the property. These are necessarily antagonistic, because their interests are directly contrary, the one to the other. It is the interest and well-understood intention of the vending party to sell as high, and of the purchasing party to buy as low, as possible. Neither party expects, nor has any right to expect, that his opponent shall make any provision to advance his interest·or forego any *bona fide* arrangement calculated to promote his own interest, for the sake of enhancing his antagonist's, nor in any way to sacrifice any rights which he has in favor of an opposing right, which is neither more just nor more sacred in the eyes of the law than his ·own. It is the function of the public policy to secure either of these classes. It simply requires that each, in the prosecution of his own interest and in the exercise of his own rights, shall act fairly. A fair competition will be enforced for the benefit of vendors. No trick, no circumvention will be allowed to prevent it. On the other hand, the bidder will be secured against all imposition. All this public policy requires, but no more. Per ·Johnston, Chancellor, in *Carson* v. *Law*, 2 *Rich. Eq.* 307.

In the language of the learned judge in *Smith* v. *Greenlee*, 2 *Dev.* 128 : ."A sale at auction is a sale to the best bidder. Its ·object, a fair price; its means, competition. * * * If this be the rule with regard to auctions instituted by private individuals, *a fortiori* should it be as to those public auctions, instituted by law for great purposes, such as execution sales, where the object is to secure the creditor, if possible, the satisfaction of his debt, and, at the same time, to obtain for the debtor a fair price for his property." Any act done, therefore, by the purchaser, or to any other party to the sale, which has the effect to prevent competition, chill the bidding, sacrifice the property, or impose upon the purchaser, is against the policy of the law, and will avoid the sale affected by such conduct. *Hamilton* v. *Hamilton*, 2 *Rich. Eq.* 355; *Dudley* v. *Odom*, 5 *S. C.* 131; *Thompson* v. *Davies*, 13 *Johns.* 114; *Troup* v. *Wood*, 4 *Johns. Ch.* 254; *Carson* v. *Law*, 2 *Rich. Eq.* 311.

Among other objectionable circumstances attending the sale, :any agreement or combination among bidders, having its foundation in a purpose to impair competition and to obtain the prop-

erty at an under value, has been held fatal to such sale.  Bidders, however, may combine, if the purpose be to promote the sale, not to prevent competition.  Any combination between a number of persons to unite their bids and to purchase property at sheriff's sale jointly, to that extent diminishes the possible number of bidders, since every member of the combination was at liberty to bid at the sale before he became bound by his agreement not to do so.  Certainly this does impair, to some extent, the chances of competition at the sale.  As said by Judge Spencer, " a public auction is open to every one."  Therefore it must be closed to none, or, as he expresses it, " there must be no combination among persons competent to bid, silencing such bidders, for the tendency to sacrifice the debtor's property is inevitable."  It is not material that the bidders so silenced should or should not intend to bid.  If being at liberty to bid, they are bought off in a way which might prevent a fair competition, the principle applies.

Hence, such combinations are regarded as unlawful and against public policy, and sufficient to avoid a sale where the price is inadequate, the only exception being where the object really was to promote competition, by increasing rather than diminishing the possible number of bidders.  This occurs where two or more persons unite in bidding, and are thus enabled to become purchasers, when neither of them could otherwise have participated in the bidding.

An examination of the cases upon this subject will fail to disclose any other principle upon which a purchase at sheriff's sale at an inadequate price, which results from such a combination of bidders, can be sustained.  The rule which avoids such contracts is said, in *Phippin* v. *Stickney*, 3 *Metc.* 385, " to apply to all combinations having for their object to stifle fair competition at the bidding, with the design of becoming the purchasers at a price less than the fair value of the property."  As already said, every such combination does have the effect of diminishing the number of persons capable of bidding at the sale, and thus may be said to stifle fair competition at the bidding; and the design of the combination in this case was, unquestionably, to secure the purchase of the property at a price less than its fair value.  Yet that

inadequacy of price was not in any way *caused* by the combination, simply as such.; but the fact known to the parties that the property, under the circumstances, would sell for an inadequate price, was the real inducement to the combination. A very different case from that where the price is unfavorably affected by such combination.

It does not appear that the object of the combination was to neutralize, as bidders, any of the persons composing it, but rather to avail themselves of circumstances which presented the opportunity of a great speculation, which, perhaps, none of them separately would have undertaken. I am not, therefore, prepared to say that the validity of the sale in this case would be destroyed by the simple fact that there was a combination of persons to bid, followed by a purchase by them at an inadequate price.

There is, however, another view to be taken of the circumstances affecting this combination, which plainly brings it within the inhibitions of the rule. Mr. Henderson, as a condition of the agreement, required the combination to agree that no matter how little the property might sell for, if they became the purchasers they would pay the balance that might remain due on the judgments represented by him and Mr. Williams; undertaking, on his part, that in that case he would secure to them assignments of the judgments so paid.

The judgment creditors, at the time when this combination was formed, were well aware of all the defects in the supposed encumbrances, and knew that the property was worth, under the circumstances, more than would pay all their debts. It is not to be doubted that their interest would have prompted them to intervene at the sale for the purpose of protecting themselves, either by bidding on the property so as to cover their judgments, or by denouncing the mortgages as worthless, secure such competition as would have resulted in a fair and open sale at an adequate price. They were only restrained from such intervention by the assurance of Mr. Henderson that their judgments would be paid through the arrangements which he proposed to make.

There could have been but one motive for the undertaking on the part of the *combined* purchasers to pay more than the amount at which the property might chance to be knocked down to them,

K

and that was to neutralize the judgment creditors—to prevent their competition as bidders at the sale, or such other interference on their part as would have removed the cloud which appeared to rest upon the title to the property in question; to prevent their disclosing their secret and thus defeating their intended speculation. In either aspect it was sufficient, under the authorities cited, to avoid the sale.

There is yet another view which, in my opinion, is sufficient to authorize the interference of the court. It is a principle of law that while the purchaser is not bound to communicate any latent facts affecting the value of the property sold, yet he must carefully abstain from any act tending to mislead the vendor or to prevent his discovery of the facts. In this case such efforts were made in order that a purchase might be secured at an under value. In *Turner* v. *Harvey,* 1 *Jac.* 178, it is said that the purchaser must do absolutely nothing to prevent the possible discovery of such secret by the vendor. And it may here be remarked that the term vendor, at a sheriff's sale, includes all those whose interest it is that the property should bring its full value. A single word (it is said in the case cited) having that tendency, is sufficient to avoid a sale under such circumstances. The rule is the same as applied to encumbrances and defects in the title to an estate, as to defects in the estate itself.

Mr. Henderson was one of the purchasers, a party to the agreement, and his associates are involved in all the consequences of *his* acts. He did take measures to prevent the discovery of the defects in the mortgages from being known to any of the parties interested, and especially any one interested in the Bath South Carolina Paper Company. See his letter to Hill & Hill, his injunction of secrecy upon Mr. Williams, and all other parties to whom he confided his secret; and all the parties taken into the combination were by him required to assume an obligation of secrecy. These were acts intended to prevent the discovery of the real condition of the property, which the law considers unconscientious and sufficient to avoid a sale which has resulted in a great sacrifice.

Again: it was *prima facie* the interest of the judgment creditors that the property should bring its full value. They were

chiefly represented by Mr. Henderson, their attorney, at this sale; one of them by Mr. Williams. In the presence and hearing of both of these gentlemen an announcement was made at the sale, before the bidding opened, that encumbrances existed affecting the value of the property to the extent of $60,000 and more. This announcement was in direct antagonism to the interests which they appeared to represent. They knew, as matter of fact, that these encumbrances did not exist. They failed to deny the statement to the contrary of the truth as known to them, made in their presence and hearing, which they knew would injuriously affect the price at which the property would sell. Thus challenged to declare the truth, they were bound in all fairness to speak. Their silence contributed to deceive all other parties at the sale, and they and their clients are estopped to deny the facts of the statements made, and with which, by their reticence, they have impressed the transaction.

Mr. Henderson was the known attorney of the plaintiffs in the executions. He was conducting the sale as such; in the eyes of the bidders he was representing parties whose interest it was to have the property bring its full value. He was ostensibly the party of the vendors at the sale. A statement known to him to be false, most injuriously affecting the price of the property, was made in his hearing to all the bidders. He knew that it was believed to be true by all present, except the party for whom he was acting. The interest which he ostensibly represented demanded that he should deny the statement. His failure to do so was equivalent to its adoption as true. *Cox* v. *Buck,* 3 *Strob.* 367; 2 *Whart.,* § 1136, *et seq. and notes.*

The property was announced to be sold by the sheriff, under and subject to this misstatement of facts, thus corroborated by the silence of the vendors; the parties bidding acted upon it; the property was sold at a great sacrifice in consequence, and Mr. Henderson became the purchaser for the benefit of himself and his associates. This cannot, under the circumstances, be considered a fair sale.

There is yet another view of the case which, in my opinion, would authorize the interference of the court. It seems to me that when a statement is made at a sheriff's sale which is, in fact,

not true, but which remains uncontradicted, and the property is, in consequence, sold at a grossly inadequate price, such a sale ought to be set aside in favor of innocent parties. In this case the statement of Mr. Wright, as to the amount of encumbrances claimed, was largely in excess of the real amount due, even had they been valid liens, and, in point of fact, they did not really exist as liens. This statement, though made in perfectly good faith, was an interference with the *bona fides* of the sale. It depreciated the property and impaired competition at the sale. Had it been made with fraudulent intent it would have certainly vitiated the sale. *Minter* v. *Dent*, 3 *Rich. Eq.* 207. It had all the effect it could have had, if fraudulently made. It was a misrepresentation of fact, however unintentional, and wrought a great wrong upon those interested in the property. It was intended to affect the sale injuriously, though with no conscious purpose of wrong. The parties at the sale acted upon it. It was, in law, a fraud upon the sale, and innocent parties should not be allowed to suffer. The inadequacy of price, considered with reference to this erroneous announcement, is such as to shock the moral sense and outrage the conscience, and the sale ought not to stand. *Rorer on Jud. Sales*, § 855, *note* 5. It is not consistent with the public policy that a sale, whose fairness is so vitally impaired by a mistaken announcement, should stand, whether the intent be fraudulent or not. It was urged at the hearing that there is a difference between the cases when the contract is executed and when it is merely executory ; that in cases of the former sort the courts will not interfere, unless they be tainted with actual fraud. While this is admitted to have some appearance of authority in the decided cases, yet there are many others in which the principles which have been made the ground of a refusal on the part of the courts to aid in the execution of an executory contract, or confirm a judicial sale when submitted to them for confirmation, have been evoked to set aside a sale made under process. In *Hamilton* v. *Hamilton*, the contract was complete, because, as was well said by Chancellor Harper, with us, " on the falling of the hammer and entry of the sale, the purchaser has a right to demand title, as a matter of course," and

the case was expressly decided as on an executed contract. 2 *Rich. Eq.* 361.

There are other grounds urged as affecting the validity of the sale which I have not discussed. One, however, I will briefly advert to. It was said that Mr. Henderson, being attorney for the judgment creditors, under whose executions the property was sold, having a duty to perform in respect of the sale, could not become the purchaser. *McCelvey* v. *Thomson,* 7 *S. C.* 185. The whole subject is fully discussed under the head of *Fox* v. *Mackreath, Lead. Cas. Eq., (vol. I.)* 172. Mr. Henderson seems to have acted with the knowledge and approval of his clients, and it is only to them that he owes any duty in this respect. They are fully satisfied with his conduct, and none others have a right to complain on this ground.

It would be a fruitless consumption of time and labor, and unnecessarily encumber this decree, to follow the learned counsel on both sides in their able and exhaustive examination of the authorities. The leading cases are those of *Hamilton* v. *Hamilton,* and *Martin and Walters* v. *Evans.* Upon the principles laid down in these cases and their corollaries, this judgment may well be rested.

The foregoing decision is placed upon the ground of fraud and public policy. I think also the sale should be set aside on the ground of mistake. Certainly all the parties affected by the sale, except the purchasers, were laboring under a delusion, the effect of which was that the property was sold at a grossly inadequate price. The sheriff, the agent of all parties, announced under this mistake that he sold the land subject to the mortgages. All the parties, save one, acted under the same mistake. The purchasers knowing this, did not correct it, but suffered the property to be sacrificed for their benefit. In *Lowndes* v. *Chisolm,* 2 *McC. Ch.* 445, the mortgagee had obtained judgment on a certain bond secured by a mortgage of the property. The sheriff levied on and sold the property, and it was bid off by the mortgagee, who supposed he was acquiring the unincumbered fee. The sale was set aside in favor of the purchaser, on the ground of mistake. In that case there was a simple mistake, without fraud or interference of any one. All parties were honestly mistaken. It was

regarded as a mistake in law, yet the party was relieved. The present is an infinitely stronger case, and there can be no doubt that, under all the circumstances, the injured parties here are entitled to relief.

In conclusion, it is due to the fact that Mr. Henderson, the chief actor in this unfortunate transaction, is a respected and honorable member of the bar, that some opinion should be expressed in regard to his conduct therein. It is a pleasure to the court to declare that the purpose of Mr. Henderson appears to have been free from any consciousness of wrong. The circumstances by which he was impelled to the course pursued, were well calculated to awaken all his zeal in behalf of his clients, and to put him to the employment of all his enterprise, energy and abilities to secure their money. This, throughout, seems to have been his leading, primary and controlling object. The conduct of Messrs. Barrett and Boyce, in relation to the execution held by them, and the publication made in the Chronicle & Constitutionalist, a newspaper of Augusta, of April 28th, 1878, in reference to the proceedings of the annual meeting, and the condition of the affairs of the Bath company, were quite sufficient to arouse the greatest suspicions, and to justify his resort to any lawful methods of securing the interests of his clients, with which he was entrusted. They indicated a general wreck of the affairs of the company, and a disposition of those controlling it to take care of themselves, and no creditor is to be censured or captiously criticised for catching at any plank floating within his reach to save himself. It is due further to say that while no doubt rests on my mind as to the correctness of the conclusions at which I have arrived, yet that condition of assurance has only been reached after some months of patient thought and an earnest investigation of the case, with all the lights afforded by the exhaustive researches and able arguments of eminent counsel. In his zeal, thus inspired by the circumstance, Mr. Henderson might very well have fallen into the mistake he has unintentionally made.

It is ordered, adjudged and decreed—

*First.* That the sale of the real estate of the Bath South Carolina Paper Company, described in the pleadings, made by the sheriff of Aiken county, on August 5th, 1878, be and the same

is hereby set aside and declared null and void, and that the conveyance for the same, made by the said sheriff, be delivered up by the holders thereof to the clerk of this court, and that the same be by him canceled and filed with the records in this case, and that such cancellation be noted in the registry where the said conveyance is recorded.

*Second.* That the said property be re-sold by the sheriff of Aiken county at public auction, after first duly advertising the same for at least twenty-one days, on the first Monday of October next, or on some convenient sale-day thereafter—if circumstances should prevent a sale on that day—for cash, and that he make title to the purchaser or purchasers for the same; and that the purchaser or purchasers be let into possession of the property on the payment of the purchase money.

*Third.* That the sheriff pay from the purchase money the costs and expenses of said sale in the first place; and next, that he pay therefrom the costs and disbursements of the plaintiffs, and M. Goldsmith & Sons, defendants, herein to be adjusted by the clerk of the court.

*Fourth.* That he next pay therefrom to William C. Langley, D. B. Hack, James G. Bailie, William C. Sibley, M. F. Foster and E. R. Schneider, or their attorney, the sum of $4605, that being the sum paid by them as purchasers at the former sale, and applied to the cost of said sale and the satisfaction of the judgments of J. Morton Poole & Co., Gilreath & Peoples, N. F. Burgess & Co., and the Goodyear Rubber Company, and in part of the judgments of Poole & Hunt against the said Bath South Carolina Paper Company, which said judgments are hereby adjudged satisfied to the extent of such application and payment.

*Fifth.* That he pay from the remainder of the purchase money the balance due on the judgment of Poole & Hunt, also the judgments of 'H. Waterbury & Co. and M. Goldsmith & Son, according to their order and priority.

*Sixth.* That he pay all other subsisting judgments against the Bath South Carolina Paper Company, if any there be, according to their order and priority.

*Seventh.* That after making all the payments hereinbefore directed, he retain the balance of the purchase money, if any, sub-

ject to the further order of the court, and any party interested therein may make application at the foot of this judgment for such further order.

*Eighth.* That the said sheriff report the performance of the duties required of him herein, to the next ensuing term of the court after said sale.

EXCEPTIONS BY DEFENDANTS. Please to take notice that the defendants, W. C. Langley, D. B. Hack, James G. Barrett, W. C. Sibley, M. F. Foster and E. B. Schneider, do except to the decree of his Honor, Judge Kershaw, filed herein, on August 6th, 1879, and do appeal therefrom, and from the judgment based thereon, to the Supreme Court of this state, and ask the reversal of said decree in so far as it orders the sale made by Sheriff Holley, mentioned in the complaint, to be set aside, and the deed of the purchasers to be delivered up and canceled, on the following grounds:

[Here follow sixteen specifications of error in the findings of fact by the Circuit decree.]

The defendants aforesaid further except to the decree of his Honor, the Circuit judge, because he concludes as matter of law upon the facts as follows:

"*Third.* That the sale made by the sheriff of Aiken county of the real estate of Bath South Carolina Paper Company on August 5th, 1878, is rendered null and void by the circumstances attending it.

"*Fourth.* That the Bath South Carolina Paper Company, the stockholders thereof, the bondholders, and the unpaid creditors, are entitled to be relieved against the said sale, and to a re-sale of the property and a distribution of the proceeds thereof, according to their several priorties and equities."

Whereas, he should have held as matters of law:

1. That the sale cannot be impeached by the Bath company for any irregularities or omissions, because they are estopped by the sheriff's deed.

2. That the sale cannot be impeached by the plaintiffs or the mortgagees; for having been made subject to their mortgages, if their mortgages are valid, they have nothing of which to com-

plain; and if their mortgages are invalid, they have no right to object.

3. That the sale can be impeached only by the creditors of the Bath company, and upon grounds which constitute fraud; there having been only two grounds taken in the complaint, viz.: The alleged agreement between the purchasers and the attorney for the judgment creditors; and, the concealment by the purchasers of the defects in the mortgages.

That such an agreement to constitute a fraud must have had the purpose and effect to prevent bidding, or to stifle competition and destroy the fairness of the sale; and his Honor having found "that it does not appear that the object of the combination was to neutralize, as bidders, any persons comprising it;" and "that to secure his clients' money was the leading primary and controlling object of Mr. Henderson, the attorney of the judgment creditors and agent of the purchasers," he should have found that the purpose of the agreement was the protection of the interests of the creditors, and its effect was to procure and induce bidders who would not otherwise have competed.

He should have held as law, it is respectfully submitted, that to constitute a sufficient ground to set aside a sale, even as between vendor and vendee, *concealment* by the purchaser must have been of *facts* which were known to him, and which the other parties did not know, and did not have the means of knowing, and facts which it was the duty of the purchaser to disclose.

That in this case the invalidity of the mortgages was, on the part of Mr. Henderson, a matter of legal *opinion*, based upon information derived from copies of papers, the originals of which were in the possession of the trustees and their attorney; while, it is respectfully submitted, his Honor erroneously holds that the invalidity of the mortgages was a *fact*, known to Mr. Henderson, and not known to the other parties.

4. It is respectfully submitted that his Honor erred in holding, that in this case, Mr. Henderson occupied a position which made it his duty to disclose the opinion which he had formed, and that his failure to make such disclosure vitiates the sale; while it is respectfully submitted that neither the creditors nor

Mr. Henderson occupied any relations of trust or confidence to any of the parties now seeking to avoid the sale, which required the disclosure of such opinion.

5. It is respectfully submitted that his Honor erred in holding that Mr. Henderson's efforts to prevent the opinon which he had formed as to the mortgages from being known to others than those to whom he thought fit to communicate it, amounted to an act "tending to mislead the vendors, or to prevent the discovery of the facts," and that such act was sufficient to avoid the sale ; whereas, it is submitted that the utmost limit of the rule in such cases is that nothing must be actually done or said, intended or calculated to mislead or deceive.

6. It is respectfully submitted that his Honor erred in holding that in consequence of the announcement made at the sale by Mr. Wright, in behalf of the mortgagees, there was such a *mistake* as constitutes sufficient ground for setting aside the sale ; whereas, it is respectfully submitted that the testimony proves that there was no such *mistake* as constitutes a legal ground for relief, but that the parties now seeking to avoid the sale were guilty of gross negligence and *laches,* from the consequence of which they seek to relieve themselves at the expense of those who, having purchased under executions of creditors, without notice of the mortgages, are entitled to have their titles and possession protected by the court.

7. That the decree is, in other respects, erroneous in law and contrary to the testimony.

*Mr. D. S. Henderson,* for appellants.

If, upon a review of the whole testimony, the findings of fact by the Circuit judge are against the weight of the testimony, they should be set aside. 4 *S. C.* 10 ; 12 *S. C.* 154. And his deductions as to motives and intentions are matters of argument only. The Circuit judge vacates the sale on "ground of fraud and public policy," and rests his decree here on 2 *Rich. Eq.* 296, 355, 368. We accept the rule laid down at page 360. This is also recognized in 5 *S. C.* 135. Both object and effect must be to stifle competition, and the object must be fraudulent. 3 *Rich. Eq.* 65 ; 4 *Strob. Eq.* 156 ; 6 *Wall.* 94. The creditors did not

expect to be bidders; they sought the purchasers—were not sought by them. Mr. Henderson was authorized to bid up to $10,000, if necessary ; and he it was who demanded, in return for his information, that his clients should be protected; while, by taking the assignments, the purchasers could re-imburse themselves by suit against the directors. The decree says that the *effect* was to produce inadequacy of price. What was being sold ? Only the equity of redemption at a full valuation, if the mortgages were held to be good. *Caveat emptor* must be reciprocal. *Broom's Leg. Max.* 608–9. What the sheriff said at the sale could not affect the interest sold. 13 *Geo.* 443. The testimony shows that the combination made the property bring a better price. The judgment creditors were forced by the actions of the company to look to themselves alone for protec- tion. All the cases cited by respondents are where the agree- ment was *not to bid.*

Again, the Circuit judge says, that the purchaser must care- fully abstain from any *act* tending to mislead the vendee, or to prevent his discovery of these facts. He says such efforts were made here, but he fails to finds any facts to support him, and there are none. The sole authority relied upon does not support him. 1 *Jacobs* 169. The law of concealment is stated in 2 *Kent* *484 ; *Kerr on F. & M.* 95–97 ; 1 *Story's Eq. Jur.*, § 149 ; 1 *Rich.* 105 ; *Story on Sales*, § 174. If equally open to both parties, no relief will be granted. 37 *Ind.* 1 ; 10 *Am.* 70. There was no fiduciary relations between the parties to this transaction. It should be noticed that the mortgages were in the hands of the mortgagees, while the judgment creditors derived their informa- tion from the recorded copies. The Circuit judge says: "And it may here be *remarked* the term *vendor, at a sheriff's sale,* includes all those whose interest it is that the property should bring its full value."

No authority is quoted to support this dictum. We differ with the learned judge. The sheriff is the only vendor at such a sale. He is certainly the agent of the parties to an execution, but this is an agency imposed and created by law, and not a voluntary agency; an agency for persons having several and opposing, not joint interests. Any misrepresentations or other

acts of parties to the execution, except the legal vendor, the sheriff, cannot vitiate the sale. 3 *Hill* 180 ; 2 *Strob.* 112 ; *Frem. on Void Jud. Sales* 14. From Mr. Henderson's reticence, when statements were made at the sale, the Circuit judge holds him and his clients estopped. If so, it would only be to the claim that $60,000 were due on the mortgages. 3 *Strob.* But as it was only matter of opinion, the doctrine of estoppel does not apply. *Big. on Estop.* 431 ; 1 *Story's Eq. Jur.*, § 191 ; 51 *Mo.* 449 ; 3 *Washb. on R. Prop.* 79 ; 21 *Penna.* 334. Again, the Circuit judge thinks that a sale at an inadequate price ought to be set aside in favor of innocent parties, when misstatements at a sale remain uncontradicted. The mortgagees were not innocent but grossly negligent parties. 2 *Sm. Lead. Cas.* 147. But the doctrine is not sound. *Kerr on F. & M.* 61 ; 15 *Minn.* 26 ; 7 *Barb.* 64 ; 3 *Hill* 180. The remaining ground of the decree is *mistake*. If mistake applies at all to sheriff's sales, mutual mistake does not. 8 *S. C.* 2. The decree rests on 2 *McC. Ch.* 455 ; but see remarks upon that case in 2 *Bail.* 635, and see 2 *S. C.* 112 ; 12 *S. C.* 488. The facts were equally open to both parties. 2 *Bail.* 418 ; 12 *S. C.* 130 ; 1 *Story's Eq. Jur.*, § 146 ; 2 *McC. Ch.* 158 ; 11 *R. I.* 565 ; 23 *Am. R.* 525 ; 50 *Cal.* 337 ; 19 *Am. R.* 655. It has been asked why Mr. Henderson did not file a bill to have the whole question settled. The answer is because it was not to his clients' interests to do so, the matter not being settled law, (1 *Hill Ch.* 106 ; 7 *Rich.* 509;) and the litigation ensuing would have been at their expense. His clients are satisfied with his course.

*Messrs. James Aldrich, Joseph Ganahl, Boykin Wright, G. W. Croft* and *J. P. Carroll,* for respondents.

Their able arguments are omitted as the ground is substantially covered by the Circuit decree, and the opinion of this court.

*Mr. C. R. Miles,* in reply.

March 3d, 1880. The opinion of the court was delivered by WILLARD, C. J. Certain creditors of the defendant corporation seek, with such defendant, to set aside a sale of the property

of such defendant made by the sheriff under execution, on the ground of alleged misconduct of the purchaser, both before and at the time of the sale, tending to depress the selling price by a combination among bidders to prevent bidding, and by other devices alleged and relied upon, whereby the property sold for a sum grossly inadequate as compared with its actual value. The facts of the case are very fully stated in the Circuit decree and need not be repeated. The leading question grows out of the fact, that, previous to the sale, the defendant corporation was largely indebted. Many judgments had been recovered against such defendant, and debts to a large amount not covered by judgments were outstanding. Prior to the sale, an agreement was made between certain parties, who afterwards became the purchasers, but who at that time had no interest in the property of the defendant corporation, but desired to become bidders at the sheriff's sale of such property, and the owners of several judgments recovered against the defendant corporation, by which it was agreed that such intended purchasers should purchase the property if it did not go beyond a certain sum, and if the sum bid for the property was not sufficient to pay off all the judgments held by the creditors who were parties to the agreement, that the purchaser would purchase said judgments from such creditors, paying the amounts due thereon and taking assignments of the same. This arrangement was carried out. The owners of the judgments provided for in the agreement did not bid at the sale, and the property was struck off to the persons thus agreeing to purchase at a sum much below its actual value.

The leading question in the case is whether this contract tended to, and did, in fact, directly interfere with the competition at the sale in such manner as to diminish the biddings and reduce the sum which, it may be assumed, would have been realized on a free and fair competition.

Nothing is more important to a complete administration of justice than that auction sales should be conducted in a manner likely to secure the fair market value of property disposed of at such sales. In the last resort, such sales become the means of carrying into effect the judgments of the courts, in the great majority of cases, and the administration of justice is as

much concerned in the manner of executing judgments as in the methods by which they are obtained. Competition is the life of auction sales, and if the influence of competition is destroyed or impaired, the auction sale ceases to be a fair test of value. It cannot be pretended that competition at an auction sale is a perfect means of ensuring the sale of property at its value, but it can be affirmed with certainty that anything that impairs the fullness and freedom of that competition tends to impair or destroy the usefulness of such sales and to impair the legal rights of the persons whose property is subjected to such sales. The result of successful bidding is a contract to which the vendor and vendee are parties, the auctioneer being their mutual agent, by whom the contract is evidenced. If then anything is done of a secret nature by the purchaser tending to prevent the sale from having its full efficacy for the benefit of the vendor, it is clear, upon the plainest principles of equality applicable to contracts generally, that such conduct is a fraud on the rights of the vendor, and vitiates the sale.

These principles have been so clearly and firmly settled by the cases in this state and elsewhere, that it is only necessary to make a general reference to them. *Carson* v. *Law,* 2 *Rich. Eq.* 296; *Hamilton* v. *Hamilton,* 2 *Rich Eq.* 355; *Martin* v. *Evans,* 2 *Rich. Eq.* 368; *Thrower* v. *Cureton,* 4 *Strob. Eq.* 155; *Johnston* v. *La Motte,* 6 *Rich. Eq.* 347; *Jones* v. *Caswell,* 3 *Johns. Cas.* 29; *Thompson* v. *Davies,* 13 *Johns.* 112; *Doolin* v. *Ward,* 6 *Johns.* 194; *Wilbur* v. *How,* 8 *Johns.* 444; *Bexwell* v. *Christie,* 1 *Cowp.* 395; *Howard* v. *Castle,* 6 *Term R.* 642; *Brawley* v. *Alt,* 3 *Ves.* 620; *Smith* v. *Clarke,* 12 *Ves.* 477; *Crowther* v. *Austin,* 2 *Car. & P.* 208.

It is definitely settled that if two or more persons in a position to become purchasers at such auction sale combine together for the purpose of preventing the property from realizing at such sale the full sum that, upon fair competition, it would be likely to realize at such sale, and one of them becomes the purchaser, the sale is fraudulent and void. *Hamilton* v. *Hamilton,* 2 *Rich. Eq.* 355; *Martin* v. *Evans,* 2 *Rich. Eq.* 368; *Dudley* v. *Odom,* 5 *S. C.* 131; *Jones* v. *Caswell,* 3 *Johns. Cas.* 329; *Thompson* v. *Davies,* 13 *Johns.* 112; *Doolin* v. *Ward,* 6 *Johns.* 194; *Wilbur*

v. *How*, 8 *Johns.* 444. *Phippin* v. *Stickney*, 5 *Metc.* 384, does not deny the rule as above laid down, but places the effect of such combination in vitiating the sale upon the ground of fraud, and only denies that proof of such fraud existed in the case there presented. *Piatt* v. *Oliver*, 1 *McLean* 295, turned on a question of pleading that did not involve the present question. There is entire harmony on this question among all the decisions having authoritative weight, and it must be regarded as settled law.

The intention to interfere with full competition is that which constitutes the fraud that vitiates the sale. When this intention appears by express proof, no question of doubt can arise. It is equally clear that if the tendency of the agreement, in legal estimation, is to produce that result, the law will infer a fraudulent intent in the absence of counter evidence. The tendency of a contract and its motive are identical in legal consideration, and the law determines the one from the other, and when nothing is shown tending to intercept or destroy that tendency, it will be assumed to have affected the sale injuriously.

One feature of the agreement before us furnishes indisputable evidence of an intent to prevent full and natural competition at the sale, and this feature has been pointed out by the Circuit decree, and is the principal ground on which it rests. It cannot be denied that parties holding judgments against the defendant corporation, by becoming parties to an agreement by which they would receive the full amount of their judgment without any effort on their part to compete at the sale, lost their motive for competing at such sale. The question whether they would or would not have competed at the sale independently of the agreement in question, is one purely speculative. It has not been shown that it was out of their power to do so if they had chosen to become bidders, leaving the question of the state of their minds on the subject to the merest speculation, that cannot, in its nature, be investigated upon evidence with any legal certainty. We are left to the conclusion that the agreement canceled their interest in bidding, and that in itself, if intended, is a wrong to the vendor. If it had appeared that the purchasers had agreed to pay off and discharge the judgments, it might be said that the defendant corporation was benefited rather than injured by an

agreement that provided for the payment of their judgments, independently of the sum that the property brought, whatever effect that might have in other respects; but as the agreement was that the purchasers should become the owners of the judgments with power to enforce them against any other property of the defendant corporation, the defendant lost the benefit of the competition that might have arisen between the owners of the judgments and the purchaser, without any corresponding advantage whatever. The purchaser cannot be assumed to have had any other interest in the contract than that of purchasing the property at the lowest rate. They do not appear to have been otherwise connected with the sale than through the motive to become the owners of the property sold, and such must be assumed to be the case. In this view their sole interest was to reduce the purchase money, and in making the agreement with the judgment creditors, the natural tendency of which was to neutralize their interest in the biddings, and thus get rid of competition, they must be deemed to have had that object in view. This is conclusive of the correctness of the Circuit decree in holding the sale invalid. It will be unneceseary to consider the other exceptions, involving, as they do, merely additional grounds for supporting the Circuit decree, as the ground already examined is sufficient for that purpose.

The decree must be affirmed and the appeal dismissed.

MCIVER and MCGOWAN, A. J.'s, concurred.